Michael COOPER, husband, in his own capacity and as parent of Abram and Adam Cooper, minors; Lidia Cooper, wife, in her own capacity and as parent of Abram Cooper and Adam Cooper, minors, Plaintiffs–Appellees,

v.

Clarence DUPNIK, Sheriff, Pima County; Tom Taylor, an employee of Pima County Sheriff's Department; Weaver Barkman, an employee of Pima County Sheriff's Department, Defendants–Appellants.

Michael COOPER, husband, in his own capacity and as parent of Abram and Adam Cooper, minors; Lidia Cooper, wife, in her own capacity and as parent of Abram Cooper and Adam Cooper, minors, Plaintiffs–Appellees,

v.

Clarence DUPNIK, Sheriff, Pima County, Defendant,

and

City of Tucson; Tucson Police Department; Peter Ronstadt; Karen Wright; Gene Scott; Timothy O'Sullivan; Kay McCall, Defendants–Appellants.

Nos. 88–15661, 88–15685.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 22, 1991.

Decided May 5, 1992.

David L. Berkman, Murphy, Clausen & Goering, Tucson, Ariz., for defendant-appellant Barkman.

Michael P. Callahan, Deputy County Counsel, Tucson, Ariz., for defendants-appellants Dupnik and Taylor.

David B. Toone, Kimble, Gothreau & Nelson, Tucson, Ariz., for defendants-appellants Ronstadt and Wright.

Stephen M. Weiss, Karp, Stolkin & Weiss, Michael J. Bloom, Winton D. Woods, Tucson, Ariz., for plaintiffs-appellees.

Before: BROWNING, HUG, SCHROEDER, FLETCHER, ALARCON, POOLE, WIGGINS, BRUNETTI, THOMPSON, LEAVY, and TROTT, Circuit Judges.

TROTT, Circuit Judge:

"It is abiding truth that '[n]othing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.' "

*Oregon v. Hass*, 420 U.S. 714, 724–25, 95 S.Ct. 1215, 1222, 43 L.Ed.2d 570 (Brennan, J., dissenting (quoting *Harris v. New York*, 401 U.S. 222, 232, 91 S.Ct. 643, 649, 28 L.Ed.2d 1 (1971) (Brennan, J., dissenting))).

Michael Cooper was arrested for rape. Pursuant to a preexisting interrogation plan, members of the Tucson Police Department and the Pima County (Arizona) Sheriff's Department ignored Cooper's repeated requests to speak with an attorney, deliberately infringed on his Constitutional right to remain silent, and relentlessly interrogated him in an attempt to extract a confession.

Eventually, the "evidence" against Cooper began to disintegrate. Cooper's interrogators concluded that he was not guilty, and so advised Peter Ronstadt, Chief of the Tucson Police Department. Nonetheless, Ronstadt subsequently told the media that Cooper properly had been identified and arrested. Further investigation fully exonerated Cooper, and he was released. Two months later, the Tucson Police Department publicly cleared him of all charges.

Cooper sued employees of the Pima County Sheriff's Department and the Tucson Police Department, as well as the agencies and municipalities for which they worked. Cooper alleged a violation of 42 U.S.C. § 1983 (1988), and various state laws; he also included a count for defamation. All of the defendants moved for summary judgment based on the doctrine of qualified immunity; the district court denied the motion. On appeal, a panel of this court reversed on all counts except the defamation claim. *Cooper v. Dupnik*, 924 F.2d 1520 (9th Cir.1991). Cooper successfully petitioned for a rehearing en banc. 933 F.2d 798 (9th Cir.1991).

The district court had jurisdiction under 28 U.S.C. § 1331 (1988). We have jurisdiction of this timely appeal pursuant to 28 U.S.C. § 1291 (1988). The district court's denial of qualified immunity is appealable pursuant to *Mitchell v. Forsyth*, 472 U.S. 511, 524–30, 105 S.Ct. 2806, 2814–18, 86 L.Ed.2d 411 (1985).

Our review of the denial of appellants' motion for summary judgment is de novo, and in conducting this review, we contemplate the evidence presented to the district court in the light most favorable to Cooper, the nonmoving party. As to the issue of qualified immunity, we look to see whether the police "acted reasonably under settled law in the circumstances." *Hunter v. Bryant*, —— U.S. ——, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (per curiam). We note that in the main, the facts on which Cooper's complaint is based are not contested.

We affirm the district court on all counts.

## I *THE PLAN TO INTERROGATE THE PRIME TIME RAPIST*

Beginning in 1984 and extending through September of 1986, residents of Tucson, Arizona were beset by a series of rapes, robberies, and kidnappings. The Tucson Police Department and the Pima County Sheriff's Department believed one person might be responsible for the attacks. That person became known as the "Prime Time Rapist."

To improve their chances of identifying and apprehending the Prime Time Rapist, Tucson Police Chief Peter Ronstadt and Pima County Sheriff Clarence Dupnik joined forces and created the Prime Time Rapist Task Force (the "Task Force"). The Task Force was made up of experienced law-enforcement officers from both agencies: its lead investigators were Detective Karen Wright from the Tucson Police Department, and Sergeant Thomas Taylor and Detective Weaver Barkman, Jr. from the Pima County Sheriff's Department. Barkman and Wright had worked together on the investigation prior to the formation of the Task Force. Sergeant Taylor was their supervisor.

Members of the Task Force planned meticulously for the day they would arrest

their first suspect. In July of 1985, Detective Barkman and the other officers developed a strategy for interrogating a Prime Time Rapist suspect. The core of their plan was to ignore the suspect's Constitutional right to remain silent as well as any request he might make to speak with an attorney in connection therewith, to hold the suspect incommunicado, and to pressure and interrogate him until he confessed. Although the officers knew any confession thus generated would not be admissible in evidence in a prosecutor's case in chief, they hoped it would be admissible for purposes of impeachment if the suspect ever went to trial. They expected that the confession would prevent the suspect from testifying he was innocent, and that it would hinder any possible insanity defense.

As a first step, Sergeant Taylor designated Detective Barkman as the Task Force's "primary interrogator," an assignment made known to everyone concerned. Taylor explained his decision as follows:

Q. [to Taylor] Now, why did you decide to designate Weaver Barkman as the interrogator for the task force?

A. My experience with Weaver.

Q. Well, why don't you elaborate on that. Explain what you mean.

A. His ability as an interrogator. I've seen him—I've worked with him. I was confident in his ability to get results.

Q. All right. And are you familiar then with the various techniques that he employs?

A. I don't—yeah. I'd guess I'd say style as opposed to techniques.

. . . .

Q. Okay. And describe his style for me, if you will.

A. I see Weaver's style as being confrontive in terms of offering somebody no hope of denying; that that's not going to work for them, that they've got to come clean, so to speak.

Q. Creating a sense of hopelessness?

A. Yes.

Q. And what you anticipated happening in this situation was that the individual would be cut off from the rest of the world because [he] wouldn't be allowed to contact an attorney and would be interrogated by Deputy Barkman who would be creating this sense of hopelessness; isn't that correct?

A. Correct.

Exhibits—Vol. I, No. 0041.

No doubt exists about the Task Force's intent. In his deposition, Barkman was quite explicit about his scheme to ignore a suspect's substantive right to remain silent while in custody, as well as any request the suspect might make to consult with counsel.

A. [from Barkman] There was—there was an agreement, at least I agreed with myself, that when we identified the Prime Time Rapist, that we would *not honor an assertion of counsel or silence.*

And, to be perfectly honest, the profile that I had was that he would immediately ask for an attorney. I knew he would, whoever he was. . . . [W]hen we find the Prime Time Rapist, I am going to continue the interrogation. I was a designated interrogator. And I said, Stoneham, this is my plan. Tom [Taylor], this is my plan. Karen [Wright], you know, whoever wants to listen, this is my plan.

That would—that would occur when there was little, if any, doubt of the guilt of the person we arrested. And this also goes hand in hand with the decision to not honor attorney—the request for an attorney. That is something that should be used only in two situations: Number one, where the—the evidence is overwhelming and the—the—the proof is evident and/or when you think you've got the wrong guy.

Exhibits—Vol. I, No. 0012 (emphasis added).

The point of flouting the requirements, announced by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that a suspect in custody be permitted to consult with an attorney prior to any interrogation, was to ensure such a suspect would not rely on his right to remain silent. In her deposition, Detective Wright explained this aspect of the plan:

Q. [to Wright] Okay. And by contacting an attorney, what effect do you think—if you had allowed Mr. Cooper to contact an attorney, what effect do you think that would have had on your ability to obtain—or ability to speak with him, to speak with Mr. Cooper?

A. I would doubt very seriously if he would speak to us at all after he contacted an attorney.

Q. All right. Is it correct, then, that you were concerned that an attorney would tell him to remain silent?

A. Yes.

Q. And thereby preventing you from interrogating Mr. Cooper?

A. Yes.

Exhibits—Vol. I, No. 0028.

With the suspect isolated from the outside world and cut off from his attorney, the plan called for Barkman to overcome the suspect's resistance and extract a confession. Sergeant Taylor had confidence in Barkman's ability to dominate Cooper's will.

Q. [to Taylor] And that's what you expected to happen to [Cooper]; *he would be interrogated by Mr. Barkman, his right to an attorney would be denied, and he would be emotionally worn down; isn't that correct?*

A. *Yes, and that he would confess.*

Q. All right. And he would confess.

A. Yes.

*Id.* (emphasis added).

According to Detective Wright, the Task Force's tactics, which included lying to the suspect about the evidence against him, were designed "to create stress." Exhibits—Vol. I, No. 0008. Barkman was more exact.

Q. [to Barkman] Is the underpinning to this direct positive confrontation, this accusatory interrogation, instilling fear in the interrogated subject?

A. No. It is the first step in creating the illusion of hopelessness, and it might ultimately instill fear. And it's going to cause them stress, but then you start trying to decide what kind of a guy am I interrogating here.

Q. Let me interrupt you a second and ask you whether or not what you're trying to do is to instill hopelessness when you use that technique?

A. Yes.

Q. Okay. And when you decided to go in and interrogate Mr. Cooper following Wright's interrogation, your objective was to use the accusatory technique; is that right?

A. That's correct.

Exhibits—Vol. I, No. 0036.

Members of the Task Force knew their intentional violation of all aspects of *Miranda* would exclude any confession from the prosecutor's case in chief. However, they hoped the confession would, in Barkman's words, "deprive [the suspect] of the opportunity of forming an insanity defense...." Exhibits—Vol. I, No. 0071. They also hoped the confession would prevent the defendant from testifying at his own trial. Sergeant Taylor stated: "The idea is if they're not going to be able to use the statement, at least it keeps him off the stand." Exhibits—Vol. I, No. 0016. As we discuss later in this opinion, they miscalculated. Because the Task Force's interrogation of Michael Cooper violated his substantive Fifth Amendment right to remain silent, rather than just the *Miranda* rules designed to safeguard that right, Cooper's statements would not have been admissible for *any* purpose.

Members of the Task Force knew their plan patently was unconstitutional. Sergeant Taylor was quite candid on the subject. Taylor indicated he "knew that [the plan] violated the law," Exhibits—Vol. I, No. 0028, and he acknowledged that his approach was not condoned by the local prosecuting attorney. Detective Wright also fully appreciated that the Task Force was treading on forbidden ground.

Q. [to Wright] All right. You are aware, are you not, through your training, your experience, the kind of in-service updating that you get from Mr. Kelly and from any other source, that when a suspect requests his counsel or requests to call an attorney, that you are to cease all questions?

A. That's correct.

Q. You know that. Okay.

And are you also aware, based upon all the experience and update training you have and so forth, that that request for an attorney must be scrupulously honored; isn't that correct?

A. That's correct.

Q. All right. And are you aware that in denying that request, that you were denying [Cooper] a constitutional right?

A. Was I aware that it was in violation of the U.S. Constitution?

Q. Yes.

A. Is that the question?

I was aware of the fact that, yes, we would be violating his—his rights.

Q. All right. Why were you willing to participate in that violation?

A. As I have stated yesterday, we had had discussions, we referring to Weaver Barkman and myself, in reference to, when the [suspect] was located, that the first thing he would invoke would be the right to an attorney. And we had very, very little evidence in terms of all the cases involved.

Exhibits—Vol. I, No. 0030 (legal objection omitted).

Barkman's thinking was identical.

First of all, traditionally, I have believed and have taught that when an attorney or when someone asserts a right of silence or attorney, cease, scrupulously honor their request, for several different reasons.

But there comes a time when in a major case having major criminal ramifications on public safety you may make a conscious decision to continue the interrogation failing to honor the request.

I have done it. I will in all probability continue to do it. I do not do it lightly.... [M]y feelings are, if you're going to do the interrogation, do it, but report it. Admit it.

Exhibits—Vol. I, No. 0033.

Michael Cooper was the second person interrogated by the Task Force. The first was John David Harrell, who also invoked his rights only to have them ignored.

Barkman described in a deposition his legal awareness and his state of mind in implementing the Task Force's plan in connection with Harrell's arrest.

A. [from Barkman] When it came to John David Harrell, he asked for an attorney and we continued—I continued the interrogation that was a given.

Q. During the interrogation he asked for an attorney?

A. I think—you know, before I even got to him he might have asked for an attorney, he may have asked me for an attorney. *I don't remember, because I had made a conscious decision prior to the interrogation that I wasn't going to stop, I was going to continue.*

....

Q. You said that you made a decision before the interrogation to—you started and then we interrupted, what did you make a decision as to?

A. *You know, whether he asked for an attorney or for his mommy or whatever he asked for, if he asked to remain silent, I wasn't going to stop. We decided it was going to be very clear-cut, forget his Miranda Rights, the hell with it.*

Q. Who is "we" that decided?

A. I did. I told him if he rescinds, if he revokes, I'm going to continue the plan here, there's just too much at stake.

Q. Who did you tell that to?

A. Everybody that was at the meetings, everybody that was at the scene of the arrest and the people involved in the case.

....

Q. When did you tell this to people?

A. From the first time that I was asked to do the interrogation until I did the interrogation.

Q. And when were you first asked to do the interrogation?

A. It seems like to me it was a month or so prior to the actual interrogation. I don't have any dates or written records of it, it was a conversation in a B level of the County building.

....

Q. You told us that you felt it was necessary to obtain a confession from Mr. Harrell in order to successfully prosecute Harrell in the V_____ case; isn't that your testimony?

A. Yes.

Q. *And yet you knew when you were interrogating Harrell that you had violated his constitutional rights, did you not?*

A. *I did.*

Q. Didn't you also know that any statement you obtained would be suppressed from evidence?

A. For the most part, I figured that's probably what would happen.

Q. What, then, was your purpose in persisting in the interrogation even after you knew his constitutional rights have been violated?

A. That's a multifaceted question. First, the first consideration we have as police officers, and in this case is we have a serial rapist and he's bad, màn. If it's John David Harrell, let's just find out if it ain't John David Harrell. Well, the rapist is still out there, we've got to find out, is this guy the East Side Rapist or not. And the way you do that is you go out and you find him and you watch him and you listen to him.

Secondly, once the J____ J____ issue came up, *I continued the interrogation, hoping that it would be at least held voluntary to keep him off the stand and to deprive him of the opportunity of forming an insanity defense,* and some of the questions went directly to the issue of sanity.

*And so those were my motives for violating, trampling on his civil rights and Mirandas, and the bottom line being, what are his damages. I mean, I'm going to violate this American citizen's rights, but look at the totality of the circumstances, the big picture, is it worth it, yeah.*

Q. That was your judgment?

A. That's my judgment.

Exhibits—Vol. I, Nos. 0068–0071 (emphasis added).

In short, the Task Force's plan was as purposefully unlawful as it was clever. Led by Barkman, this group of law-enforcement officers made a calculated decision to take the law into their own hands, to "trampl[e] on ... civil rights and Mirandas" because in the "big picture," it was "worth it, yeah."

The Task Force's plan was in step with the overall philosophy of the Pima County Sheriff's Department and the Tucson Police Department. According to Barkman, the Task Force's plan was well known to his supervisors, including Sheriff Dupnik, Major Douglas, and Tucson Assistant Chief of Police Leverenz. Barkman testified in his deposition that he told his supervisors about the plan, that no one voiced any reservations, and that Sergeant Taylor explicitly agreed to it.

When questioned generally about his Department's interrogation policies, Sheriff Dupnik gave the following revealing answers:

Q. [to Dupnik] Suppose a detective is interrogating someone and the person very clearly and unambiguously says *I do not want to answer any questions until I have a lawyer present.*

A. And then they continue to ask questions?

Q. Yes. Is that a violation of any policy of the Pima County Sheriff's Department?

A. No, sir.

Q. So your office condones that?

A. Yes, sir.

Q. Do you encourage it?

A. It depends on the circumstances. *You know, I can see a lot of good reasons why people ask questions beyond the point that they know if the person answers it's not going to be admissible in court.*

Q. What would those be?

A. Where we have a responsibility to try to ... save somebody else's life.

Exhibits—Vol. I, No. 0026 (emphasis added).

## II THE PLAN AS APPLIED TO COOPER

### A COOPER BECOMES A SUSPECT

On May 7, 1986, an identification technician for the Tucson Police Department named Timothy O'Sullivan, whose primary responsibility was to produce color photographs for the police laboratory, decided with no input from the Task Force that Michael Cooper might be a suspect of its investigation. The record shows that O'Sullivan had not done any substantial fingerprint work for at least six (and possibly nine) years. He previously had failed the state's fingerprint examination. Nevertheless, he obtained Cooper's known fingerprints and compared them—hastily and without following proper procedure—with latent fingerprints lifted as evidence from the scene of one of the Prime Time Rapist's attacks, known as No. 470.[1]

O'Sullivan concluded he had a match, and he asked the supervisor of the lab, Mr. Scott, to verify his conclusions.[2] Scott, who also was not a certified latent fingerprint examiner, confirmed O'Sullivan's match; O'Sullivan called Detective Wright and reported the finding.

Wright came to the lab and asked O'Sullivan to check Cooper's known prints against latent prints lifted at the scene of another attack, No. 302. O'Sullivan had some difficulty making a match, but Scott looked at the prints and concluded he had a positive comparison. When Sergeant Taylor was informed of this development, he ordered the immediate arrest of Michael Cooper.

O'Sullivan and Scott were mistaken: the latent prints at crime scenes Nos. 470 and 302 did not belong to Michael Cooper. These mistakes, however, were not discovered until it was too late to avoid some of their consequences.

### B COOPER'S INTERROGATION

At approximately 3:00 P.M. of the same day, Barkman and Wright located Cooper in the office of the Pima County Probation Department,[3] where Cooper was initially interviewed for twenty to thirty minutes. Barkman's plan to undermine Cooper's right to remain silent was in effect from the moment he and Detective Wright walked through the door. At the outset of the interview, which was tape-recorded, Barkman fully advised Cooper of his *Miranda* rights, but deliberately turned the advisement into what he hoped Cooper would perceive as a joke. Barkman's psychological ploy was designed to make Cooper ignore the warnings, and begin to talk. Barkman intended to undercut Cooper's Constitutional right not to talk to the Task Force by complying with *Miranda*'s safeguards in form only, not in spirit or in substance. For example, after he first jokingly asked Cooper if Cooper had a rights card, Barkman said, "I could read you my driver's license if you like."

In his deposition, Barkman was candid about his charade.

Q. [to Barkman] My question is: At one point in time did you joke with [Cooper] about reading, instead of from a rights card, reading him your driver's license?

A. That's correct.

Q. You were kind of joking around with him about that?

A. *I wanted him to perceive what I did as a joke,* but I wasn't joking. There was a reason for that.

Q. That was a technique?

A. Yes.

Q. That's exactly the point I am trying to make, that you sort of joked around with him about reading him his rights?

A. Sure. He would think I was joking around.

---

1. In a taped affidavit for a telephonic search warrant dated May 7, 1986, this attack is referred to as No. 407 as well as No. 470.

2. According to William Watling, a fingerprint expert for the Arizona Department of Public Safety (the "DPS"), both Scott and O'Sullivan had applied for the position of latent print examiner with the DPS but had not passed the required competency tests. Watling described Scott's and O'Sullivan's actions as "incomprehensible."

3. Cooper was on probation for a fraud conviction.

Q. Fair enough. You weren't joking, but you adopted this interview technique or approach?

A. That's correct.

Q. All right. And, in fact, you told him that—not to get excited by the fact that you were reading him his rights; isn't that correct?

A. That's correct.

Q. That was part of your technique, as well?

A. Sure.

Q. And in fact you said to him, in terms of reading him his rights, just because you are reading the rights doesn't mean he can't get up and just walk away?

A. That's correct.

Q. You wanted to create this very loose relaxed atmosphere?

A. Yes.

Q. The purpose was so he would talk with you?

A. That's correct.

Q. *You didn't want him to think that when you told him he had the right to remain silent, you didn't want him to actually say "I am gonna remain silent"?*

A. No, I didn't.

Q. When you told him he had the right to have an attorney appointed for him, you didn't want him to request an attorney?

A. No, I didn't.

Exhibits—Vol. I, No. 0004 (emphasis added). At the end of this interview, during which Cooper denied he was the Prime Time Rapist, he formally was arrested. Cooper then made the first of two unequivocal requests for an attorney, a request which Barkman and Wright expected, and which they deliberately ignored, in conformity with their plan.

Cooper was then transported to the Pima County Sheriff's Department. Detective Wright told Sergeant Taylor of Cooper's request for an attorney, and Taylor ordered the interrogation to begin.

Wright and Barkman both participated in Cooper's interrogation. Wright went first, and Barkman acknowledged that when he took over, he intended to "go in there and hammer him." In accord with the plan, the record amply demonstrates that Cooper was subjected to Barkman's interrogation techniques designed to instill stress, hopelessness, and fear, and to break his resistance.

The following are brief excerpts from the transcript of Cooper's interrogation, which illustrate the intense nature of the proceedings during which Cooper, although innocent, states he is starting to break.

[Detective Weaver Barkman:] Do you know why I became a police officer? I like people, I want to help people. I want to help you, but the evidence speaks for itself. There's alot of reasons, push[ed] far enough Mike, push[ed] far enough all people are capable of any act imaginable, these women were not,

[Michael Cooper:] I want to talk to my lawyer, Nancy Pastero (ph), as soon as possible sir, and I will not give you any more of my honesty because you are not buying it. And you say you got evidence to hold me,

[Barkman:] What do you mean hold, hold, hold, we're not holding, you're arresting, arrest. The handcuffs, the jail _____ or not,—Let's go.

. . . .

[Barkman:] Listen, why don't you look at it realistically,

[Cooper:] Alright.

[Barkman:] from a legal point of view. What you're saying is that you leave your home,

[Cooper:] Right.

[Barkman:] at night,

[Cooper:] Sometimes

[Barkman:] for extended periods of time, hours at a time,

[Cooper:] Okay.

[Barkman:] and no one on God's green earth knows where you are except you.

[Cooper:] That's right. Most people that I've encountered who are strangers that, and people that know me at some of the lakes, that are fishing their also,

[Barkman:] Pull out your hands,

[Cooper:] but when you're

[Barkman:] Your hands.

[Cooper:] what,

[Barkman:] Let's see. Do you work with your hands,

[Cooper:] Yes. I have been since last November more so than ever.

[Barkman:] ____ are you good with your hands?

[Cooper:] No ____ a bitch, ... cause I bump into things, and I can't put a screw in right, cut electrical cables,.... Please let me go.

[Barkman:] Mike,

[Cooper:] I'm not your man.

[Barkman:] Mike.

[Cooper:] It just happened Monday again, it's gonna happen again if you don't catch this guy,

[Barkman:] Mike, listen to me.

[Cooper:] You're so convinced, I wish you weren't so convinced.

 . . . .

[Barkman:] Okay. You know what it's like to be in jail don't you?

[Cooper:] I can imagine, sir, yes I can imagine. I can imagine what it's like to be away from the people that you feel secure with, that you feel good with, and you didn't do what they're accusing you of, especially

[Barkman:] ... Mike,

 . . . .

[Cooper:] can I say something, on why my attitude with you is very defensive. I do apologize ____, but I, I, I am trying to understand the severity—I mean I understand how severe this is and it seems like you folks here at Pima County and the City of Tucson with this, with this fucking guy,

[Barkman:] Yeah.

[Cooper:] have now come into Michael Cooper's life.

[Barkman:] Mike

[Cooper:] And Michael Cooper did not,

[Barkman:] .... it seems ____

[Cooper:] Well, I'm trying to make this clear to me, it, it can't happen.

[Barkman:] It did happen. And you're going to be indicted and you're going to

be given a—perhaps a public defender, maybe ____,

[Cooper:] What, you, you're charging me on this.

[Barkman:] Yes. Absolutely.

[Cooper:] You can't do that, it's not me.

 . . . .

[Barkman:] and when you start having sex with people,....

[Cooper:] ... you're making me sick, sir.

 . . . .

[Barkman:] and.... when you use rubbers ____,

[Cooper:] I don't need to hear this,

[Barkman:] when you use rubbers semen escapes,

[Cooper:] Alright then, let's talk to my wife about rubbers because I can't use rubbers sir.

[Barkman:] Well, you're gonna put your wife on the stand,

[Cooper:] Why not, if it means my family and my ____,

[Barkman:] Good point, why don't you use rubbers?

[Cooper:] Because I can't get an erection with the damn things, never could. That's why she's been pregnant so quickly between the two babies. And every month we worry because she can't take birth controls cause she has a reaction, so that's why I abstain from sex a whole lot, because we don't want her to get pregnant so much, do you understand.

[Barkman:] Well, I sure would like to, I'm sure that __

[Cooper:] ... how many times ____ sit and tell somebody that, you know,

[Barkman:] ....

[Cooper:] Well, I mean, I'm willing to cooperate in any way possible,

[Barkman:] Sure ... at some point and time your gonna have your opportunity to tell that to a jury.

[Cooper:] What time,

[Barkman:] At the trial,

[Cooper:] Are you telling me that there's no other suspects in this case sir?

[Barkman:] I'm telling you, you did it.

[Cooper:] You, you're gonna eat your words someday. You're gonna say, Mi-

chael Cooper, _____ I was doing my job, here's exactly what I feel is going to happen between you and I, someday, and I hope it's tonight, you're gonna, I do, I hope it's tonight, you're gonna say, Mike try to understand, you had some problems doing other things, you were, you were a suspect, and I was only doing my job. And I hope we shake hands and that will be it. But sir, your words are upsetting me, and I'm not this person that you're looking for—believe me, believe me. Please believe me, please, it's not me, it's not me.

[Barkman:] Mike, the evidence speaks for itself.

[Cooper:] The evidence somehow it's,

[Barkman:] ....

[Cooper:] ... I have respect for law enforcement, I have respect for your tests, and I'm sitting here knowing that I didn't do these things, and you're telling me you have evidence that it was me,

....

[Barkman:] To the best of my knowledge you have never in your life physically hurt a human being.

[Cooper:] That's not true.

[Barkman:] Perhaps in self-defense.

[Cooper:] No, that's not true.

[Barkman:] Alright, let's talk about that.

[Cooper:] There was times when I've lashed out at my wife verbally. I've slapped my wife several times. But I haven't done that in some years.

[Barkman:] I think you're doing much better, Mike.

[Cooper:] Yeah, I'm breaking down.

[Barkman:] No, no, no. I mean ...

[Cooper:] Cause you want me to admit that I did this and I didn't do these things.

[Barkman:] Mike, do you remember when you were a kid?

[Cooper:] Yeah.

[Barkman:] Your judaica background?

[Cooper:] Right.

[Barkman:] You know, some of my friends are Jewish and they tell me that guilt is built in, to be Jewish is to be guilty. And Mike, I've sat in thousands of rooms on thousands of nights in the last seventeen years and I've seen people talk and tell me things that they would tell to no one else in the world. You know how many criminals I've talked to? Two, maybe three.

....

[Barkman:] You start talking about slapping your wife and lashing out at her verbally. And you come to the point of tears. You know why?

[Cooper:] Cause I'm not proud of that.

[Barkman:] You're scared and you're upset and you feel guilty about it and I ...

[Cooper:] Because you're putting it all together.

Excerpt of Record at Appendices G, E, B (errors in original).

Cooper was reduced to a state of agitation and anxiety marked by tears and sobbing as he persistently maintained his innocence in the face of Barkman's onslaught. He repeated his request for an attorney, stating, "I want to talk to my lawyer, Nancy Pastero (ph), as soon as possible, sir, and I will not give you any more of my honesty because you're not buying it." This request, which contains a statement of unwillingness to talk, as well as a desire to consult an attorney, was disregarded. The record contains evidence indicating he was traumatized by this encounter and later suffered post-traumatic stress syndrome. In the middle of the interrogation, even the hardened veteran Weaver Barkman was, in his own words, "upset," "angry," displaying "a lot of emotion," and "leak[ing] emotionally." Exhibits—Vol. I, Nos. 0049, 0050.

There came a time well into the interrogation, however, when Barkman concluded that Cooper was innocent. Barkman exited the interrogation room and reported his conclusion to Sergeant Taylor. When he did so, the scene (which we piece together from different parts of Barkman's deposition) was dramatic.

A. [from Barkman] That they saw me come out of the interrogation room, and I was upset, and I was angry. A lot of emotion on my part. And I think what the task force people saw was one of the

senior partners *who was supposed to get the confession from the Prime Time Rapist,* who had profiled him, who had done this and done that, suddenly was getting feet of clay. Something was wrong. And they—I think it was their way of trying to build me back up *to get me back into this fight.* You can only do so much, Weaver, things like that.

And there were other conversations about trying to get—get me put back together so I could get it together enough to go back in there.

....

A. My impression is Karen [Wright] was there, Milne was there, and I told him what—what I felt. And Tom [Taylor] may very well have been present when I gave him my don't—didn't fucking do it speech.

Q. Well, then what did Tom Taylor do?

A. He said something very close to fingerprints do not lie. Get your ass back in there, Weaver.

Q. All right. *So he ordered you to go back in and continue the interrogation?*

A. *Yes.*

Q. And did you do that?

A. No.

Q. Why not?

A. I balked.

Q. What did you tell him?

A. I—I don't remember the exact words, but I started saying, look, Tom, this, that, this, that. I've got problems, real problems, man.

....

Q. Well, how come you didn't go back in there at that point in time?

A. For several different reasons. It was becoming—and, true, this is hindsight. But it was becoming clear to me that I could no longer deny my feelings that *we got the wrong guy.*

Q. Okay.

A. And the further—I mean, the more we do to this guy, there—you know, *there could be potential liability.*

But the main problem I had was I am a high reactor, I leak emotionally.

*Id.* (emphasis added).

Despite Barkman's misgivings, Taylor had his mind made up about Cooper's guilt, and was not going to let anything interfere with his goal of securing a confession. At one point during the interrogation, Mary Kay McCall, a fingerprint examiner with the Tucson Police Department, was summoned by Taylor to the Task Force's headquarters. McCall described what happened next. "I walked in the door, was met by a man I thought to be Sergeant Taylor. He said, come with me, *I want to try to force a confession out of this man.*" Appendix for Motion for Summary Judgment of Facts filed in Behalf of Pima Co. Etc., Section H, at 32 (emphasis added). Taylor did confront Cooper with McCall and the fingerprint evidence, but the confrontation did not produce the intended result.

At about 9:00 P.M. that evening, with Cooper still maintaining his innocence, the interrogation ceased. He was then booked in the Pima County Jail where he may have had access to a telephone. The plan, although implemented with great intensity, had failed to yield a confession.

## C THE "EVIDENCE" AGAINST COOPER UNRAVELS

After Mary Kay McCall had been used by Sergeant Taylor in an attempt to break Cooper by confronting him with the "positive" fingerprint match, she returned to the Tucson Police Department to double-check her comparison of Cooper's known prints and the latent fingerprints from crime scenes Nos. 470 and 302. After considerable work, removed (as she describes it) from the "pressure" generated by the Task Force, she concluded that a mistake might have been made. She called O'Sullivan and Scott to inform them of her revelation, but they ignored her and declined to reexamine the exemplars. At approximately 11:30 P.M., she called the Task Force, and talked to Sergeant Taylor. She advised him that the matches were inconclusive. He ordered her to come to a conclusion.

After more examination of the fingerprint evidence generated by McCall's concern, the persons working on the fingerprint comparisons concluded that they did not have a match after all. They found sufficient discrepancies to cancel the points of comparison, and they reported their findings to Sergeant Taylor. On May 8, 1986, at about 10:00 A.M., Scott, Taylor, Barkman, and Wright met to discuss the fingerprint evidence. The following is Sergeant Taylor's description of the meeting.

Q. [to Taylor] And who's leading the charge there? I assume you were. You're the sergeant.

A. Yeah. I don't suppose it was a charge more than it was a, hey, tell me what's going on here.

Q. Okay. Did you seek out somebody specifically?

A. Gene Scott.

....

Q. So what's Scott tell you?

A. That they're withdrawing the positive identification, that there's—these eleven or twelve points are still there, but there's these dissimilarities. And he explains those things in terms of maybe being shadow prints, prints over prints, stretch marks. I couldn't understand what it was that the problem was.

Q. Why didn't you ask him what the problem was?

A. I did.

Q. Okay.

A. And it was that business about the discrepancies overrules the twelve points. And my question was, if you've got twelve points, then shouldn't you be able to say that it's him. And his response was, no, because the discrepancies are there.

Q. *So he told you that they were withdrawing the positive identification and he's not saying that it's him?*

A. *Correct.*

*Id.* at 236.

Although (1) the fingerprint match now had been withdrawn, (2) Cooper vigorously

was proclaiming his innocence, and (3) the Task Force's crack interrogator thought they had the wrong man, Sergeant Taylor still believed that Cooper was the Prime Time Rapist. He explained his opinion as follows:

Q. [to Taylor] Okay. And that was based upon what now?

A. Their insisting that the points were there, but the discrepancies overrode the points; that they couldn't say there was positive identification, so they were going to send them off to the FBI to clarify that issue.

Q. *Okay. So if you put aside that information, what basis did you have to believe Mr. Cooper was responsible for [the] G__ and F__ [rapes] [Nos. 470 and 302]?*

A. *If you put that aside, surely none.*

Q. *You had none.*

*Okay. But I thought you said you still wanted to go ahead with the prosecution.*

A. *Yeah. Yeah, I was—I was betting on the come.*

Q. Okay. Based on what?

A. That the FBI was still going to come through and say [that the latent fingerprints were Cooper's].

*Id.* at 240.

## D COOPER'S RELEASE

Next, the Task Force met with the local prosecuting attorney. Sergeant Taylor argued to keep Cooper in jail, but Barkman at this point insisted Cooper was innocent. The prosecuting attorney was not persuaded by Sergeant Taylor, and Cooper finally was released during the afternoon of that day, May 8, 1986, nearly twenty-four hours after his arrest. During his incarceration, and despite two attempts to contact an attorney, Cooper apparently had no contact with the outside world—including his family.[4]

---

**4.** We reject counsel's statement to augment the factual record with an irrelevant affidavit about standard booking procedures prepared on April 5, 1991.

## E POLICE STATEMENTS TO THE MEDIA

During the evening of May 7, 1986, the day Cooper was arrested, Sergeant Taylor told the media "what we have caught is a man who has committed two rapes of twenty we are looking at." Taylor made this statement knowing that (1) Cooper did not fit the physical description of the rapist given by the victims of the two rapes in question, and (2) Barkman believed Cooper was not responsible for these incidents.

The next day, after it became apparent to Chief Ronstadt that Cooper had been misidentified by his crime lab, Ronstadt met with representatives of the media to explain Cooper's release. Prior to this appearance, Chief Ronstadt had been briefed about irregularities in the print-comparison procedures resulting in the misidentification of Cooper. During the briefing, when Chief Ronstadt asked for an explanation of the mistake, Scott told him, "I just screwed up." Nevertheless, Chief Ronstadt told the media he had no reason to believe negligence was involved in Cooper's misidentification.

On May 9, 1986, the fingerprints in question were given for comparison to qualified experts of the Arizona DPS. Later that day, the DPS advised Sergeant Taylor that the latent prints did not belong to Cooper, verifying the belated conclusion of Taylor's own officers. Sergeant Taylor accepted this result as accurate even though the same prints were later sent to the FBI for examination.

In July of 1986, two months after Cooper's release, and after the FBI had confirmed the mismatch of Cooper's prints, the Tucson Police Department publicly announced Cooper had been cleared. In the interim between his arrest and the announcement clearing him, Cooper alleges that he and his family were evicted from their residence, that he was fired from his job, and that he suffered serious injury to his business and personal reputation.

## III COOPER'S LAWSUIT

### A THE COMPLAINT

On January 8, 1987, Cooper and his wife filed a civil action in the United States District Court for the District of Arizona. The lawsuit named the following defendants: Pima County, the Pima County Sheriff's Department, Pima County Sheriff Clarence Dupnik, Detective Weaver Barkman, Jr., Sergeant Tom Taylor, the City of Tucson, the City of Tucson Police Department, Detective Karen Wright, Chief Peter Ronstadt, and the fingerprint identification technicians, including Gene Scott, Timothy O'Sullivan, and Mary Kay McCall. In his Second Amended Complaint, filed on November 25, 1987, Cooper alleged nine counts under 42 U.S.C. § 1983, and nine counts under state tort law, including false arrest, malicious prosecution, defamation, false-light invasion of privacy, intentional infliction of emotional distress, trespass, conversion, negligence, and conspiracy. These state claims are not at issue in this appeal.

The federal civil rights claims in Cooper's Second Amended Complaint are as follows:

Count One: Denial of Right to Counsel and Right to Remain Silent.

Count Two: False Arrest.

Count Three: False Imprisonment.

Count Four: Improper Training and Procedures.

Count Five: Injury to Reputation and Property Interests.

Count Six: Invasion of Privacy.

Count Seven: Illegal Search and Seizure (Residence).

Count Eight: Illegal Search and Seizure (Automobile).

Count Nine: Conspiracy.

We note that Cooper sues in connection with the interrogation for the alleged violation of his substantive Constitutional rights, not merely for violations of the procedural safeguards provided by *Miranda.* He now concedes, however, that the Sixth Amendment right to counsel is inapposite because he never formally was charged in court with a crime. *See Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964).

## B THE DISTRICT COURT DENIES SUMMARY JUDGMENT

On October 24, 1988, the district court held a hearing on motions for summary judgment filed by the appellants. Appellants Dupnik, Taylor, and Barkman (the "Pima County appellants") were successful on all § 1983 counts except Count One (Denial of Right to Counsel and Right to Remain Silent), and Count Nine (Conspiracy). The Pima County Appellants specifically appeal the rejection of their asserted defense of qualified immunity with respect to Count One.[5]

Appellants City of Tucson, Ronstadt, Wright, Scott, O'Sullivan, and McCall (the "City of Tucson appellants") were unsuccessful on Count One (Denial of Right to Counsel and Right to Remain Silent), Count Two (False Arrest), Count Three (False Imprisonment), Count Four (Improper Training and Procedures), Count Five (Injury to Reputation and Property Interests), and Count Nine (Conspiracy). They filed a notice of appeal based on the rejection of their defense of qualified immunity, but they did not address Counts Two, Three, Four, or Nine in their briefs, asking instead only that judgment be reversed as to Counts One and Five.

We consider only those counts addressed by appellants in their respective briefs—Counts One, Five,[6] and Nine.[7] The heart of our opinion concerns Count One: the Denial of Right to Counsel and Right to Remain Silent. We leave intact the rulings of the district court as to the other counts.

## IV OVERVIEW OF ANALYSIS

With respect to their handling of Cooper's interrogation, all appellants argue that the record in this case clearly presents a situation in which they are entitled as a matter of law to a complete defense of qualified immunity as defined by the Supreme Court in *Mitchell*. They point to the holding in *Mitchell* that clarifies both the standard of review we apply as well as the test for determining whether they are entitled to their claimed defense.

An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took.

*Mitchell*, 472 U.S. at 528, 105 S.Ct. at 2816 (footnote omitted).

The appellants characterize their conduct as simply "continuing with custodial interrogation after a request for counsel." At most, they concede a violation of *Miranda* safeguards, not the underlying Fifth Amendment substantive right to remain silent that *Miranda* was designed to protect. They argue with respect to Count One that because *Miranda* safeguards are not themselves mandated by the Constitution, citing *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), failure to abide thereby does not offend the Constitution. Thus, they conclude 42 U.S.C. § 1983, which requires a violation of a "right[ ] ... secured by the Constitution," is manifestly inapplicable. The only clearly established consequence of "disregarding *Miranda*," they argue, is "the risk" that any evidence obtained thereby may be ruled inadmissible

---

**5.** This interlocutory appeal is properly before us pursuant to *Mitchell*, 472 U.S. at 524–30, 105 S.Ct. at 2814–18.

**6.** We do not disturb the panel's holding with respect to the defamation claim, Count Five. *See Cooper*, 924 F.2d at 1531–36.

**7.** As for the conspiracy count, it remains intact as it relates to viable substantive counts.

against the questioned suspect in a criminal trial, not that they would be subjected to civil liability. To paraphrase their position at oral argument, the Fifth Amendment is satisfied if any statement at issue is not used in court. In support of this position, they point to the rule that permits the use of a statement obtained in violation of *Miranda* to impeach a defendant who takes the stand and presents a different story. *See Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Counsel for Sheriff Dupnik even asserts that "extensive case law permits this conduct" in arguing that this case did not merit rehearing en banc. None of the appellants seek to justify the Task Force's conduct on the ground that they were confronted with exigent circumstances.

Section 1983 imposes civil liability on any person who, acting under color of state law, deprives a United States citizen of his federal Constitutional or statutory rights.[8] *See Martinez v. California,* 444 U.S. 277, 284, 100 S.Ct. 553, 558, 62 L.Ed.2d 481 (1980); *Wood v. Ostrander,* 879 F.2d 583, 587 (9th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990). Cooper is a United States citizen, and the appellants in this case are police officers and employees of police departments, who were at all relevant times acting under color of state law.

Cooper's suit in connection with this appeal hinges on whether the appellants deprived him of a Constitutional right. *See Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (section 1983 " 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' " (citation omitted)). The original panel in this case concluded Cooper did not state a cause of action under § 1983 because, although his request for counsel was not honored,

[t]he Miranda warnings and rights are not themselves constitutionally mandated, but are rather procedural safeguards, or prophylactic measures, to ensure that the Fifth Amendment right against compulsory incrimination is not violated.

. . . .

Although there is no case on point from our circuit, all out-of-circuit cases hold that a plaintiff may not, as a matter of law, maintain a section 1983 action based upon the failure by the police to issue Miranda warnings.... [Because] Miranda requirements are not a constitutional prerequisite, their violation cannot form the basis of a section 1983 suit. *Cooper,* 924 F.2d at 1527 (citations and footnote omitted); *see id.* at 1528 n. 13.

The panel rejected Cooper's claim on four additional grounds. First, it concluded Cooper's Fourteenth Amendment rights were not violated because Cooper did not confess to any crime. *Id.* at 1529. Second, it overlooked *Miranda*'s primary holding that the Constitutional right against compulsory self-incrimination, known as the right to remain silent, is applicable to suspects in police custody; as a result, it rejected Cooper's Fifth Amendment claim. *See id.* at n. 17. Third, the panel determined Cooper's substantive due process rights were not violated because the Task Force's conduct did not " 'shock[ ] the conscious' [sic]," *id.* at 1530 n. 20 (quoting *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)). Fourth, the panel decided that all appellants were protected from suit by the doctrine of qualified immunity, because "[t]here are simply no section 1983 substantive due process cases with similar facts." *Id.* at 1531.

We respectfully disagree with the majority of the original panel on each of these issues. First, the record reveals Cooper made statements which could and probably would have been used against him had he gone to trial. Detective Wright was asked

---

**8.** 42 U.S.C. § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the depriva-

tion of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

if she believed the interrogation produced information that substantiated Cooper's involvement in two of the cases. Her answer was: "There was information from my interview with him that, yes, I thought it could." Exhibits—Vol. I, No. 0064. Cooper's statements were the product of impermissible conduct by the Task Force; the fact that they did not technically qualify as a "confession" is irrelevant. *See* Part V, *infra.*

Second, to characterize the Task Force's conduct as a mere violation of *Miranda*'s prophylactic advisement requirements is to see a hurricane as but a movement of air. The appellants in this case engaged in the premeditated elimination of Mr. Cooper's substantive Fifth Amendment rights, not merely the disposal of the procedural safeguards designed to protect those rights. Thus, Cooper's statements were "compelled" and "coerced." *See* Part VI, *infra.*

By the same reasoning, Cooper's Fourteenth Amendment rights also were violated. It is irrelevant that Cooper's coerced statements were never introduced against him at trial. The Task Force's wrongdoing was complete at the moment it forced Cooper to speak. This case does not involve an inchoate Constitutional violation. *See* Part VII, *infra.*

Third, the Task Force's conduct unquestionably shocks the conscience, and thus violates substantive due process. The original panel conceded that "the question is a close one," *Cooper*, 924 F.2d at 1530, but then concluded there was no violation. With all respect, we do not think the question is close: the Task Force's conduct was iniquitous, and surely does "more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically." *Rochin*, 342 U.S. at 172, 72 S.Ct. at 209. *See* Part VIII, *infra.*

Fourth and finally, the appellants are not protected by the doctrine of qualified (good-faith) immunity. Qualified immunity protects officials from suits under § 1983 for violations of rights which are not "clearly established at the time of the challenged actions...." *Mitchell,* 472 U.S. at 528, 105 S.Ct. at 2816. But this case does not involve any borderline Constitutional rights. There is no question that the Constitutional holding in *Miranda* is "clearly established" law; similarly, there is no question that the appellants' conduct violates both the Fifth Amendment itself (as opposed to just the *Miranda* rules designed to protect it), and the Fourteenth Amendment. Appellants knew they were violating the Constitution. *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (qualified immunity is not available to officials who "knowingly violate the law"). *See* Part IX, *infra.*

For these reasons, we believe that Cooper, relying on multiple theories, has made out a prima facie case under § 1983 against the appellants. Accordingly, we affirm the district court on all counts and remand the case for trial. Our analysis follows.

## V COOPER'S STATEMENTS

■ The original panel in this case concluded Cooper's suit faced "an insurmountable problem ... because Cooper, an innocent man, was never coerced into a confession." *Cooper*, 924 F.2d at 1529. The dissent responded to that point:

> The position of the court is that if unlawful police interrogation overcomes the will of a guilty suspect who then confesses, the suspect has been denied [his Constitutional rights] and has a civil rights action against his interrogators; but if the suspect is innocent rather than guilty and so has nothing to confess, the same kind of interrogation is no violation ... and the innocent man has no redress for violation of his ... rights. Our law has many subtleties and turnings, but such a counter-intuitive result cannot be, and is not, the law.

*Id.* at 1538 (Noonan, J., concurring and dissenting). We agree.

Indeed, four hours of interrogation produced statements from Cooper which the prosecution might have used at trial. Cooper admitted that he had slapped his wife, and that he often left his home, unaccompanied, at night, sometimes for hours at a time. Although far less than a complete confession, these statements might have been useful to the prosecution. As we

have pointed out, Detective Wright stated in her deposition that she felt Cooper's statements would have been useful as evidence. Cooper's statements would have hindered any insanity defense. Accordingly, they support a Constitutional violation. As the Court stated in *Miranda,*

[n]o distinction can be drawn between statements which are direct confessions and statements which amount to "admissions" of part or all of an offense. *The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory."* If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word....

*Miranda,* 384 U.S. at 476–77, 86 S.Ct. at 1629 (emphasis added); *see Rhode Island v. Innis,* 446 U.S. 291, 301 n. 5, 100 S.Ct. 1682, 1690 n. 5, 64 L.Ed.2d 297 (1980) (quoting *Miranda* ); *United States v. Brown,* 720 F.2d 1059, 1065–66 & n. 7 (9th Cir.1983) (same).

Accordingly, we conclude that Cooper did make statements which, for purposes of this case, are sufficient to constitute a breach of his right to remain silent. The next question is whether those statements were "compelled," "coerced," or "involuntary" in violation of the Fifth and Fourteenth Amendments.

## VI *FIFTH AMENDMENT*

No person ... shall be compelled in any criminal case to be a witness against himself....

U.S. Const. amend. V.

■ The keys to understanding Cooper's Fifth Amendment theory of § 1983 liability

are (1) *Miranda*'s primary holding that the Fifth Amendment right not to be compelled to be a witness against oneself applies in police stations as well as before grand juries and in courtrooms, and (2) Barkman's statement that the explicit purpose of his plan was to defy the invocation by an arrested suspect of his right to silence and to make him confess. In the light of Barkman's purpose, the attempt to force Cooper to confess can only be seen as an attempt to compel him to be a witness against himself.

In *Brown v. Walker,* 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896), the Supreme Court referred to the origins of the Fifth Amendment, and observed: "with one accord, [the states] made a denial of the right to question an accused person a part of their fundamental law, so that a maxim, which in England was a mere rule of evidence, became clothed in this country with the impregnability of a constitutional enactment." *Id.* at 597, 16 S.Ct. at 647. The Court forcefully repeated this observation seventy years later in *Miranda,* and in so doing held that the Constitutional prohibition against compelling a person to be a witness against himself, made applicable to the states in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), is "fully applicable during a period of custodial interrogation." *Miranda,* 384 U.S. at 460–61, 86 S.Ct. at 1620. In discussing this holding, the Supreme Court said:

We have recently noted that the privilege against self-incrimination—the essential mainstay of our adversary system—is founded on a complex of values. All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government—state or federal—must accord to the dignity and integrity of its citizens. To maintain a "fair state-individual balance," to require the government "to shoulder the entire load," to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the govern-

ment seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. In sum, the privilege is fulfilled only when the person is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will."

*Id.* at 460, 86 S.Ct. at 1620 (citations omitted).

The appellants—and the dissenting opinions—argue that the present case involves only a violation of prophylactic safeguards, and not Constitutional rights. But this argument completely ignores the first and fundamental aspect of *Miranda,* which extends the Fifth Amendment into police stations. By focusing exclusively on the second part of the Court's opinion, which articulates safeguards designed to protect the substantive Constitutional right to remain silent, the appellants discount their violation of that right itself.

To emphasize this central point, we review in some detail the Court's opinion in *Miranda.* Before arriving at the issue of safeguards, the *Miranda* Court spent many pages surveying in-custody interrogation practices prevalent in the United States in the 1940s, 1950s, and 1960s. It did so in an effort to answer its first question: Must the right to remain silent be pushed back to police stations, or should it apply only in the courtroom? *See id.* at 460–61, 86 S.Ct. at 1620 ("The question in these cases is whether the privilege is fully applicable during a period of custodial interrogation."). The Court observed that contemporary police interrogation practices were laden with psychological coercion, and it concluded that the practices were in their essence identical with the interrogation practices outlawed in the Fifth Amendment by the Framers of our Constitution. The Court said:

It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. To be sure, this is not physical

intimidation, but it is equally destructive of human dignity. *The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself.*

*Id.* at 457–58, 86 S.Ct. at 1619 (emphasis added).

It summed up its holding on this point with the following statement:

Today, then, there can be no doubt that *the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way* from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

*Id.* at 467, 86 S.Ct. at 1624.

Once it had established the Constitutional right not to be compelled to be a witness against oneself in police stations, the Court was confronted with the necessity of ensuring that the right would survive in the pre-court setting to which it was being extended. To accomplish this objective, the Court ordered that all custodial interrogations be preceded by a specified advisement of rights. The objective of this advisement is to ensure an accused is both aware of his substantive Constitutional right to silence, as well as his continuous opportunity to exercise that right. It is no accident that the first words out of a police officer's mouth during a *Miranda* advisement must be: You have "a right to remain silent." *Id.* at 444, 86 S.Ct. at 1612; *see*

*also id.* at 460, 86 S.Ct. at 1620. This warning is required as a *procedural* safeguard, but more importantly it expresses a *substantive* Constitutional right—the right to remain silent rather than answer incriminating questions posed by the police. It is wrong, therefore, to relegate this part of the advisement to the status of "only a prophylactic device": It is a prophylactic device, but it expresses a substantive right.

■ The *Miranda* Court added a dimension to the advisement that is particularly relevant to the present case: the right to consult counsel prior to interrogation, and to have counsel present during any questioning.[9] The rationale given for injecting counsel into the pretrial process is prophetic as it pertains to the present case.

The circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of one merely made aware of his privilege by his interrogators. Therefore, *the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege* under the system we delineate today. Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process. A once-stated warning, delivered by those who will conduct the interrogation, cannot itself suffice to that end among those who most require knowledge of their rights. A mere warning given by the interrogators is not alone sufficient to accomplish that end. Prosecutors themselves claim that the admonishment of the right to remain silent without more "will benefit only the recidivist and the professional." Even preliminary advice given to the accused by his own attorney can be swiftly overcome by the secret interrogation process. Thus, the need for counsel *to protect the Fifth Amendment privilege* comprehends not merely a right to consult with counsel prior to questioning, but also to have counsel present during any questioning if the defendant so desires.

The presence of counsel at the interrogation may serve several significant subsidiary functions as well. If the accused decides to talk to his interrogators, the assistance of counsel can mitigate the dangers of untrustworthiness. With a lawyer present the likelihood that the police will practice coercion is reduced, and if coercion is nevertheless exercised the lawyer can testify to it in court. The presence of a lawyer can also help to guarantee that the accused gives a fully accurate statement to the police and that the statement is rightly reported by the prosecution at trial.

*Id.* at 469–70, 86 S.Ct. at 1625 (citations omitted) (emphasis added). Again the point is clear: A right to consult with counsel before and during police questioning is essential *to protect the suspect's Fifth Amendment right to remain silent.*

■ The Court concluded its discussion of the required pre-interrogation procedures with this lucid and simple order: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. at 1627 (footnote omitted). As to a request by a suspect to consult with an attorney, the Court was equally clear: "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. at 1627. A request for an attorney is thus regarded as an invocation of the substantive right to remain silent.

The Supreme Court in the ensuing years has not wavered from its holding that a request for counsel requires the cessation of interrogation. In *Fare v. Michael C.,* 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979), the Court referred to *Miranda*'s "*rigid rule that an accused's request for an attorney is per se an invocation of his Fifth Amendment rights,* requiring that all interrogation cease." *Id.* at 719, 99 S.Ct. at 2569 (emphasis added). In *Innis,*

---

**9.** The parties agree that the Sixth Amendment's right to counsel as formal adversary proceedings begin is inapplicable in this case. *See* page 1234, *supra.*

the Court repeated these requirements, referring to the suspect's "undisputed right under *Miranda* to remain silent and to be free of interrogation until he had consulted with a lawyer." 446 U.S. at 298, 100 S.Ct. at 1688 (footnote omitted).

To erase any scintilla of doubt, the Court in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)—yet another case generated by the Tucson Police Department—republished its holdings in *Miranda, Michael C.*, and *Innis*, stating: "We reconfirm these views and, to lend them substance, emphasize that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Id.* at 485, 101 S.Ct. at 1885. In 1983, in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Court stated that its purpose in *Edwards* was to protect an accused in police custody "from being badgered by police officers." *Id.* at 1044, 103 S.Ct. at 2834.

The distinction, advanced by the appellants' counsel, between police conduct that abridges a person's Constitutional privilege against compulsory self-incrimination, on one hand, and police conduct that merely departs from *Miranda's* prophylactic safeguards without violating the privilege that those safeguards were designed to protect, on the other, is not new. It was explored at length in *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), a case predating Cooper's interrogation by more than ten years. The Court acknowledged this distinction and then drew the following lines with respect to its inquiry:

> For purposes of analysis in this case we believe that the question ... [of whether evidence secured downstream of an interrogation is admissible] is best examined in two separate parts. We will therefore first consider whether the police conduct complained of directly infringed upon respondent's right against compulsory self-incrimination or whether it instead violated *only* the prophylactic rules developed to protect that right. We will then consider whether the evidence derived from this interrogation must be excluded.

*Id.* at 439, 94 S.Ct. at 2361 (emphasis added).

The Court reviewed the history and the purpose of the privilege against self-incrimination, and concluded that the case presented only a "safeguards," rather than a "rights," violation.

> A comparison of the facts in this case with the historical circumstances underlying the privilege against compulsory self-incrimination strongly indicates that the police conduct here *did not deprive respondent of his privilege against compulsory self-incrimination as such, but rather failed to make available to him the full measure of procedural safeguards associated with that right since Miranda. Certainly no one could contend that the interrogation faced by respondent bore any resemblance to the historical practices at which the right against compulsory self-incrimination was aimed.* The District Court in this case noted that the police had "warned [respondent] that he had the right to remain silent," and the record in this case clearly shows that respondent was informed that any evidence taken could be used against him. The record is also clear that respondent was asked whether he wanted an attorney and that he replied that he did not. Thus, his statements could hardly be termed involuntary as that term has been defined in the decisions of this Court. Additionally, there were no legal sanctions, such as the threat of contempt, which could have been applied to respondent had he chosen to remain silent. He was simply not exposed to "the cruel trilemma of self-accusation, perjury or contempt."

*Id.* at 444–45, 94 S.Ct. at 2364 (citations and footnotes omitted) (emphasis added).

The conduct of the police in the present case, unlike that in *Michigan v. Tucker*, is precisely the type of conduct that concerned the Court in *Miranda* and its immediate predecessor, *Escobedo v. Illinois*, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). The Court in *Miranda* made clear that it remained concerned about the use of

physical brutality in the pursuit of confessions, but it focused primarily on psychological coercion, which by 1966 appeared for the most part to have supplanted "the third degree." Quoting *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960), the Court wrote:

As we have stated before, "Since ... [1940] this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition."

*Miranda,* 384 U.S. at 448, 86 S.Ct. at 1614. After discussing in detail and as background the contemporary standard psychological ploys used by police to interrogate suspects, the Court said:

In the cases before us today, given this background, we concern ourselves primarily with this interrogation atmosphere and the evils it can bring.

. . . .

*In these cases, we might not find the defendants' statements to have been involuntary in traditional terms. Our concern for adequate safeguards to protect precious Fifth Amendment rights is, of course, not lessened in the slightest.* In each of the cases, the defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures. The potentiality for *compulsion* is forcefully apparent....

It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner. This atmosphere carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity. The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—*that the individual may not be compelled to incriminate himself.* Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.

From the foregoing, we can readily perceive an intimate connection between the privilege against self-incrimination and police custodial questioning.

*Id.* at 456–58, 86 S.Ct. at 1618–19 (footnote omitted) (emphasis added). The Court punctuated this discussion with the observation that it would be "absurd" to deny that a confession obtained under the factual scenarios of the four *Miranda* cases was compelled.

This led the Court to this conclusion:

We are satisfied that *all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning.* An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.

*Id.* at 461, 86 S.Ct. at 1621 (footnote omitted) (emphasis added).

Based on the foregoing, we conclude that Cooper adequately has stated a cause of action under § 1983 for a violation *in the sheriff's department* of his clearly established Fifth Amendment right against self-incrimination. Barkman and his companions conspired not only to ignore Cooper's response to the advisement of rights pursuant to *Miranda,* but also to defy any assertion of the Constitution's Fifth Amendment substantive right to silence, and to grill Cooper until he confessed. Accepting the facts as they stand essentially uncontested in the record, Cooper's interrogators tried first to trick him into foregoing his right to silence by turning the *Miranda* advisement into a farce. The Supreme Court had this tactic in mind when it said:

Moreover, any evidence that the accused was threatened, tricked, or cajoled into a

waiver will, of course, show the defendant did not voluntarily waive his privilege. The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation.

*Id.* at 476, 86 S.Ct. at 1629.

When Barkman's trick failed, the Task Force turned to interrogation tactics that by any measure were impermissibly coercive. The clear purpose of these tactics was to make Cooper talk, and to keep him talking until he confessed. The Task Force refused to honor Cooper's rights when Cooper asserted them, and simply continued questioning him as if no request for counsel had been made. This tactic was designed to generate a feeling of helplessness, and we are sure it succeeded. "[T]he lawyer is the one person to whom society as a whole looks as the protector of ... [a suspect] in his dealings with the police and the courts." *Michael C.*, 442 U.S. at 719, 99 S.Ct. at 2569. With his requests to see a lawyer disregarded, Cooper was a prisoner in a totalitarian nightmare, where the police no longer obeyed the Constitution, but instead followed their own judgment, treating suspects according to their whims.

If the evisceration of *Miranda* warnings and the indifference to repeated requests for counsel were not enough, the police continuously badgered Cooper for four hours in an attempt to avulse a confession. Taylor admits his purpose was to force Cooper to confess, and Barkman describes his approach as "hammer[ing]." Cooper asked again to see his attorney, but his interrogators pressed on. The questioning was harsh and unrelenting. At one point, Cooper stated, "I'm breaking down," but the questioning continued. Cooper told

Barkman, "you're making me sick, sir," but the questioning continued. Barkman himself noted that Cooper was "scared" and "upset," but the questioning continued. Cooper was reduced to sobbing and pleading his innocence, but still the questioning continued. Although Cooper never was attacked physically, this is precisely what the Court had in mind in *Blackburn* when it "recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn*, 361 U.S. at 206, 80 S.Ct. at 279.

Although Cooper did not retreat from his protestations of innocence, he did make a lengthy statement, and it is our view that every word he uttered after he was taken to the sheriff's department was compelled.[10] Cooper's treatment presents a prima facie case of law-enforcement behavior that violates the Fifth Amendment's privilege against self-incrimination.

We stress again that this case does not deal with a product of police interrogation that is just technically involuntary, or presumptively involuntary, as those terms are used in *Miranda* jurisprudence, but with a product that was involuntary *because it was actively compelled and coerced* by law-enforcement officers during in-custody questioning, as those terms are used in *Miranda, Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), and *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Our holding is consistent with the teaching of *Michigan v. Tucker*, and it does not create a Fifth Amendment cause of action under § 1983 for conduct that merely violates *Miranda* safeguards without also trespassing on the

10. The Task Force's Plan may constitute a prima facie case of a conspiracy to deprive arrested suspects of their Constitutional privilege against self-incrimination. Because counsel did not mention 18 U.S.C. § 241 (1988) until their reply brief, we do not address the implications of that law in this opinion. Section 241 states:

If two or more persons conspire to injure, oppress, threaten, or intimidate any inhabitant of any State, Territory, or District in the free exercise or enjoyment of any right or

privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same....

....

They shall be fined not more than $10,000 or imprisoned not more than ten years, or both....

The Task Force's treatment of its first suspect, John David Harrell, is tantamount to a first overt act in implementing this conspiracy, with Cooper's treatment being the second.

actual Constitutional right against self-incrimination that those safeguards are designed to protect. This case does not establish a cause of action where police officers continue to talk to a suspect after he asserts his rights and where they do so in a benign way, without coercion or tactics that compel him to speak. What we do confront is a case laden with police misconduct that is "identical with the historical practices [of incommunicado interrogation] at which the right against self-incrimination was aimed." *Tucker*, 417 U.S. at 444, 94 S.Ct. at 2364.

## VII *FOURTEENTH AMENDMENT*

We turn now to Cooper's theory of § 1983 liability that the Task Force violated his substantive due process rights under the Fourteenth Amendment. His claim encompasses two theories, and we discuss each in turn.[11]

## A MATURATION OF THE VIOLATION

■ Can the coercing by police of a statement from a suspect in custody ripen into a full-blown Constitutional violation only if and when the statement is tendered and used against the declarant in court? We think not. The Supreme Court in 1936 established clearly and beyond anyone's misapprehension the proposition that the Constitution, as a limit on the behavior of government officials, flatly prohibits coercion in the pursuit of a statement from a

person suspected of a crime. *See Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). The Court did so as a matter of substantive due process of law demanded by the Fourteenth Amendment, and in so doing it said:

> In an earlier case the Supreme Court of the State had recognized the duty of the court to *supply corrective process where due process of law had been denied*. In *Fisher v. State*, 145 Miss. 116, 134, 110 So. 361, 365, the court said: "Coercing the supposed state's criminals into confessions and using such confessions so coerced from them against them in trials has been the curse of all countries. It was the chief iniquity, the crowning infamy, of the Star Chamber, and the Inquisition and other similar institutions. The constitution recognized the evils that lay behind these practices and prohibited them in this country.... The duty of maintaining constitutional rights of a person on trial for his life rises above mere rules of procedure and *wherever the court is clearly satisfied that such violations exist, it will refuse to sanction such violations and will apply the corrective*."

*Id.* at 287, 56 S.Ct. at 465 (omission in original) (emphasis added).

■ Many things are clear in this passage, but in the context of the present case, one is particularly relevant: The due process violation caused by coercive behav-

---

**11.** In *Graham,* the Court addressed a lawsuit under § 1983 in which the plaintiff, Graham, sought to recover damages for injuries sustained when police officers used excessive force during the course of an investigatory stop. *Graham,* 490 U.S. at 388, 109 S.Ct. at 1867. The lower courts considered Graham's claims under Fourteenth Amendment substantive due process. *See id.* at 390–92, 109 S.Ct. at 1868–71. The Supreme Court reversed. *Id.* at 392, 109 S.Ct. at 1869. It stated that the Fourth Amendment, not the Fourteenth Amendment, was the correct Constitutional provision under which to analyze a § 1983 suit for excessive force in an arrest or investigatory stop. The Court noted, " '[t]he first inquiry in any § 1983 suit' is 'to isolate the precise constitutional violation with which [the defendant] is charged'...." *Id.* at 394, 109 S.Ct. at 1871 (citation and footnote omitted; second alteration in *Graham*). *See Hammer v. Gross,* 932 F.2d 842, 845–46 (9th Cir.) (following *Gra-*

*ham), cert. denied, —— U.S. ——,* 112 S.Ct. 582, 116 L.Ed.2d 607 (1991). *Graham* indicates that in the context of § 1983, the Court favors the use of specific provisions in the Bill of Rights, such as the Fifth Amendment, over the more general notions of the Fourteenth Amendment's Due Process Clause. This may be particularly true as to claims brought under the Fourteenth Amendment's "shock the conscience" theory, created in *Rochin,* 342 U.S. at 172, 72 S.Ct. at 209, a case that predates *Malloy* and *Miranda.* Because statements of an accused continue to be analyzed under both the Fifth and Fourteenth Amendments, and because *Rochin's* theory of § 1983 liability is still viable, Cooper is entitled to avail himself of all three theories. The district court, however, would be well advised not to commingle the theories. *See Ward v. City of San Jose,* 948 F.2d 1097, 1101–03 (9th Cir.1991).

ior of law-enforcement officers in pursuit of a confession is complete with the coercive behavior itself. As the Court said, "it would be difficult to conceive of methods more revolting to the sense of justice than those taken to procure the confessions of these petitioners...." *Id.* at 286, 56 S.Ct. at 465. The actual use or attempted use of that coerced statement in a court of law is not necessary to complete the affront to the Constitution. Contrary to the appellants' argument, this is not just a rule of evidence. All a court does in a judicial context is apply the corrective where due process already has been denied. Our analysis on this point is confirmed by numerous observations of the Supreme Court. In *Innis,* the Court notes that " '[t]he fundamental import of the [Fifth Amendment] privilege ... [goes to] whether [the suspect] can be interrogated....' " 446 U.S. at 300, 100 S.Ct. at 1689 (quoting *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630) (emphasis removed). In *Tucker,* the Court states: "Where the State's actions offended the ... Due Process Clause, the State was then deprived of the right to use the resulting confessions in court." 417 U.S. at 441, 94 S.Ct. at 2362. Hence, the fact that Cooper never formally was charged in court and that none of his statements ever were offered in evidence to his potential detriment is relevant only to damages, not to whether he has a civil cause of action in the first place.

## B POLICE CONDUCT

This case does not involve physical torture; but torture is not necessary to render "coercive" police conduct in the pursuit of a confession. Psychological coercion can suffice. In *Spano,* a case involving no physical brutality or violence, the Supreme Court, in finding a violation of the Due Process Clause of the Fourteenth Amendment, said:

> The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endan-

gered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves. Accordingly, the actions of police in obtaining confessions have come under scrutiny in a long series of cases. Those cases suggest that in recent years law enforcement officials have become increasingly aware of the burden which they share, along with our courts, in protecting fundamental rights of our citizenry, including that portion of our citizenry suspected of crime. The facts of no case recently in this Court have quite approached the brutal beatings in *Brown v. Mississippi,* or the 36 consecutive hours of questioning present in *Ashcraft v. Tennessee* [322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) ]. But as law enforcement officers become more responsible, and the methods used to extract confessions more sophisticated, our duty to enforce federal constitutional protections does not cease. It only becomes more difficult because of the more delicate judgments to be made. Our judgment here is that, on all the facts, this conviction cannot stand.

*Spano,* 360 U.S. at 320–21, 79 S.Ct. at 1206 (citations and footnote omitted).

In 1978, the Supreme Court was called on again to illuminate the due process protections of the Constitution against coercive police conduct. The occasion was *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), a case which encompassed many of the issues in the present case. *Mincey,* like the present case, was generated by the Tucson Police Department; and the source of the issue with respect to Mincey's statement was a refusal by an officer of the Tucson Police Department to abide by the dictates of *Miranda.* In view of the question presented here as to whether the law on the subject of coercing confessions was clearly established (which appellants would have us examine in the light of the impeachment exception to the prohibition against the use of some unlawfully obtained evidence), we quote extensively from the Supreme Court's opinion:

Since there will presumably be a new trial in this case, it is appropriate to consider also the petitioner's contention that statements he made from a hospital bed were involuntary, and therefore could not constitutionally be used against him at his trial.

Mincey was brought to the hospital after the shooting and taken immediately to the emergency room where he was examined and treated. He had sustained a wound in his hip, resulting in damage to the sciatic nerve and partial paralysis of his right leg. Tubes were inserted into his throat to help him breathe, and through his nose into his stomach to keep him from vomiting; a catheter was inserted into his bladder. He received various drugs, and a device was attached to his arm so that he could be fed intravenously. He was then taken to the intensive care unit.

At about eight o'clock that evening, Detective Hust of the Tucson Police Department came to the intensive care unit to interrogate him. Mincey was unable to talk because of the tube in his mouth, and so he responded to Detective Hust's questions by writing answers on pieces of paper provided by the hospital. Hust told Mincey he was under arrest for the murder of a police officer, gave him the warnings required by *Miranda v. Arizona,* and began to ask questions about the events that had taken place in Mincey's apartment a few hours earlier. *Although Mincey asked repeatedly that the interrogation stop until he could get a lawyer, Hust continued to question him until almost midnight.*

After a pretrial hearing, the trial court found that Mincey had responded to this interrogation voluntarily. When Mincey took the witness stand at his trial his statements in response to Detective Hust's questions were used in an effort to impeach his testimony in several respects. On appeal, the Arizona Supreme Court indicated its belief that because Detective Hust had failed to honor Mincey's request for a lawyer, the state-

ments would have been inadmissible as part of the prosecution's case in chief. But, relying on *Harris v. New York,* and *Oregon v. Hass,* it held that since the trial court's finding of voluntariness was not "clear[ly] and manifest[ly]" erroneous the statements were properly used for purposes of impeachment.

Statements made by a defendant in circumstances violating the strictures of *Miranda v. Arizona* are admissible for impeachment if their "trustworthiness ... satisfies legal standards." But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law "even though there is ample evidence aside from the confession to support the conviction."[12] If, therefore, Mincey's statements to Detective Hust were not " 'the product of a rational intellect and a free will,' " his conviction cannot stand. In making this critical determination, we are not bound by the Arizona Supreme Court's holding that the statements were voluntary. Instead, this Court is under a duty to make an independent evaluation of the record.

It is hard to imagine a situation less conducive to the exercise of "a rational intellect and a free will" than Mincey's. He had been seriously wounded just a few hours earlier, and had arrived at the hospital "depressed almost to the point of coma," according to his attending physician. Although he had received some treatment, his condition at the time of Hust's interrogation was still sufficiently serious that he was in the intensive care unit. He complained to Hust that the pain in his leg was "unbearable." He was evidently confused and unable to think clearly about either the events of that afternoon or the circumstances of his interrogation, since some of his written answers were on their face not entirely coherent. Finally, while Mincey was being questioned he was lying on his back on a hospital bed, encumbered by tubes, needles, and breathing apparatus. He was, in short, "at the complete mer-

---

**12.** *But see Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (harmless error rule applies to admission of coerced confessions).

cy" of Detective Hust, unable to escape or resist the thrust of Hust's interrogation.

In this debilitated and helpless condition, Mincey clearly expressed his wish not to be interrogated. As soon as Hust's questions turned to the details of the afternoon's events, Mincey wrote: *"This is all I can say without a lawyer." Hust nonetheless continued to question him,* and a nurse who was present suggested it would be best if Mincey answered. Mincey gave unresponsive or uninformative answers to several more questions, and then said again that he did not want to talk without a lawyer. *Hust ignored that request and another made immediately thereafter.* Indeed, throughout the interrogation Mincey vainly asked Hust to desist. Moreover, he complained several times that he was confused or unable to think clearly, or that he could answer more accurately the next day. But despite Mincey's entreaties to be let alone, Hust ceased the interrogation only during intervals when Mincey lost consciousness or received medical treatment, and after each such interruption returned relentlessly to his task. The statements at issue were thus the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness.

There were not present in this case some of the gross abuses that have led the Court in other cases to find confessions involuntary, such as beatings.... But "the blood of the accused is not the only hallmark of an unconstitutional inquisition." Determination of whether a statement is involuntary "requires more than a mere color-matching of cases." It requires careful evaluation of all the circumstances of the interrogation.

It is apparent from the record in this case that Mincey's statements were not "the product of his free and rational choice." To the contrary, the undisputed evidence makes clear that Mincey wanted not to answer Detective Hust. But Mincey was weakened by pain and shock, *isolated from family, friends, and legal counsel,* and barely conscious, and his will was simply overborne. *Due process of law requires that statements obtained as these were cannot be used in any way against a defendant at his trial.*

*Id.* 437 U.S. at 396–402, 98 S.Ct. at 2415–18 (citations and footnotes omitted) (emphasis added).

 We repeat the message sent to the Tucson Police Department in 1978. In making the following points, it could hardly be clearer: First, pressuring a suspect to talk can be impermissibly coercive, even if no physical brutality is used. Second, the impeachment exception is limited to statements that are not involuntary. Third, police must respect the Fifth Amendment *and Miranda.*

A case often cited by courts engaged in determining independently whether specific police conduct in the pursuit of confessions falls short of due process is *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). The conduct in *Haynes* lacked physical violence or brutality, but it did involve considerable psychological pressure designed to force a confession from the suspect. The Court once again confirmed the principle that the Fourteenth Amendment demands that statements taken from a suspect by police be the "voluntary product of a free and unconstrained will." *Id.* at 514, 83 S.Ct. at 1343.

We cannot blind ourselves to what experience unmistakably teaches: that even apart from the express threat, the basic techniques present here—the secret and incommunicado detention and interrogation—are devices adapted and used to extort confessions from suspects. Of course, detection and solution of crime is, at best, a difficult and arduous task requiring determination and persistence on the part of all responsible officers charged with the duty of law enforcement. And, certainly, we do not mean to suggest that all interrogation of witnesses and suspects is impermissible. Such questioning is undoubtedly an essential tool in effective law enforcement. The

line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused. But we cannot escape the demands of judging or of making the difficult appraisals inherent in determining whether constitutional rights have been violated. We are here impelled to the conclusion, from all of the facts presented, that the bounds of due process have been exceeded.

*Id.* at 514–15, 83 S.Ct. at 1343–44.

■ We are guided by the Supreme Court's observation in *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), that "the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." *Id.* at 116, 106 S.Ct. at 452–53; *see also United States v. Wolf,* 813 F.2d 970, 976 n. 16 (9th Cir.1987). Accordingly, we conclude that the facts and circumstances presented by Cooper state a cause of action under § 1983 for a violation of his right not to be subjected during custodial interrogation to police conduct that denies him the exercise of his "free and unconstrained will," a right to which he was entitled by the Due Process Clause of the Constitution. "The ultimate test remains that which has been the only clearly established test in Anglo–American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker?" *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).

Following the traditional "test of voluntariness," we have no doubt that Cooper's statements to the Task Force "were the product of a will overborne." *Davis v. North Carolina,* 384 U.S. 737, 742, 86 S.Ct. 1761, 1765, 16 L.Ed.2d 895 (1966). Cooper was advised improperly of his *Miranda* rights. Police officers may not make a mockery of our Constitutional law by turning an advisement of rights into a persiflage. The fact "that a defendant was not [properly] advised of his right to remain silent or of his right respecting counsel ... is a significant factor in considering the voluntariness of statements later made." *Id.* at 740, 86 S.Ct. at 1764; *see Robichaud v. Ronan,* 351 F.2d 533, 534 (9th Cir.1965).

Cooper's substantive right to silence was ignored, and as previously discussed in Part VI, *supra,* he admittedly was hammered, forced, pressured, emotionally worn down, stressed, and infused with a sense of helplessness and fear—all in an effort to extract a confession. During hours of mistreatment and what can fairly be described as sophisticated psychological torture, Cooper's will was overborne. The Due Process Clause clearly forbids this. Had Cooper been tried as the Prime Time Rapist, any competent judge would have excluded his statements for *all* purposes, including impeachment. What the Task Force did constitutes a twentieth-century inquisitorial version of the Star Chamber. The behavior of the Task Force far exceeds the amount and kind of psychological pressure condoned by this court in *United States v. Thierman,* 678 F.2d 1331 (9th Cir.1983), or by the Seventh Circuit in *United States v. Rutledge,* 900 F.2d 1127 (7th Cir.1990), two cases upon which appellants place great reliance. In summary, Cooper's statements were both compelled and involuntary.

## VIII *SHOCK THE CONSCIENCE*

■ There is a second Fourteenth Amendment substantive due process yardstick available to Cooper as a theory of § 1983 liability. The test is whether the Task Force's conduct "shocks the conscience." *Rochin,* 342 U.S. at 172, 72 S.Ct. at 209. *Rochin* outlawed all police conduct that "offend[s] those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most hei-

nous offenses." *Id.* at 169, 72 S.Ct. at 208 (quoting *Malinski v. New York*, 324 U.S. 401, 416–17, 65 S.Ct. 781, 789, 89 L.Ed. 1029 (1945)). We address this issue last not because it is less significant than the Fifth Amendment compulsion and due process coercion claims already discussed, but because an explication of the facts in connection with those claims is necessary to determine whether the "canons of fairness and decency," referred to in *Rochin*, were violated by the activities of the Task Force in dealing with Cooper.

In *Rutherford v. City of Berkeley*, 780 F.2d 1444 (9th Cir.1986), we noted that the Court in *Rochin* "did not articulate specific standards for identifying what constitutes a substantive due process violation but concluded that it lies where government conduct 'shocks the conscience'...." *Id.* at 1446 (citation omitted). Most frequently, substantive due process violations that have made their way into court pursuant to § 1983 involve police brutality. As we said in *Ostrander*, however, "while brutality by police or prison guards is one paradigmatic example of a substantive due process violation, it does not exhaust the possibilities." 879 F.2d at 589. We went on to conclude that the abandonment of a passenger in a high crime area by a state trooper could constitute a substantive due process violation as a violation of a clearly established liberty interest.

Accordingly, assuming again that the facts are as alleged by Cooper and as they appear in the record, we must decide whether a substantive due process violation along the lines contemplated in *Rochin* has been demonstrated. We are convinced that it has.

In so concluding, we begin from the conduct of the appellants as spelled out in Parts I and II of this opinion. We then measure that conduct against the Constitutional canons of decency and fairness as elaborated in Parts VI and VII, and add other relevant considerations which we find aggravating in this context.

The primary aggravating circumstance is the Task Force's purpose of making it difficult, if not impossible, for a charged suspect to take the stand in his own defense— as Taylor said, "to help keep him off the stand." By forcing Cooper to talk in the police station, the officers hoped to prevent him from being able to do so in the courtroom. We note that their purpose was not just to be able to impeach him if he took the stand and lied, but to keep him off the stand altogether. This tactic corrupts the doctrine established in *Harris*.

*Harris* was a case where no *Miranda* warnings were administered before the disputed statement was taken. The statement was used to impeach Harris after he took the stand and changed his account. The Supreme Court permitted such impeachment in that case, and the rule it forged has become known as the "impeachment exception" to *Miranda*. But *Harris* was a case where "no claim [was made] that the statements made to the police were coerced or involuntary," *Harris*, 401 U.S. at 224, 91 S.Ct. at 645, or that the police knowingly engaged in calculated misconduct in order to secure the disputed evidence. Moreover, it does not appear that the purpose of the police in *Harris* in securing the disputed evidence was to impinge on the suspect's right to remain silent or his right to testify. In these respects, *Harris* is manifestly distinguishable and thus inapposite to the present case.

This distinction and the scope of the impeachment exception in *Miranda* cases became crystal clear in 1975 in *Hass*. In justification of the impeachment exception, and to distinguish it from situations involving coercion or duress, the Court said the following:

> The only possible factual distinction between *Harris* and this case lies in the fact that the *Miranda* warnings given Hass were proper, whereas those given Harris were defective. The deterrence of the exclusionary rule, of course, lies in the necessity to give the warnings. That these warnings, in a given case, may prove to be incomplete, and therefore defective, as in *Harris*, does not mean that they have not served as a deterrent to the officer who is not then aware of their defect; and to the officer who is

aware of the defect the full deterrence remains. The effect of inadmissibility in the *Harris* case and in this case is the same: inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth.

One might concede that when proper *Miranda* warnings have been given, and the officer then continues his interrogation after the suspect asks for an attorney, the officer may be said to have little to lose and perhaps something to gain by way of possibly uncovering impeachment material. This speculative possibility, however, is even greater where the warnings are defective and the defect is not known to the officer. In any event, the balance was struck in *Harris*, and we are not disposed to change it now. *If, in a given case, the officer's conduct amounts to abuse, that case, like those involving coercion or duress, may be taken care of when it arises measured by the traditional standards for evaluating voluntariness and trustworthiness.*

*Hass*, 420 U.S. at 723, 95 S.Ct. at 1221 (emphasis added). Bluntly put, there is no such thing as an impeachment exception for compelled, coerced, or involuntary statements. The clarity of this proposition is beyond question, and under the circumstances of this case, the Task Force's unlawful plot to deprive an accused suspect of the privilege of testifying in his own defense finds no support whatsoever in the settled law.

The unlawful nature of this aspect of the plan is exacerbated by the plan's second purpose of curtailing an accused suspect's right to present an insanity defense, if such was available. Again, the purpose was to deprive a suspect of the defense altogether, not just to defeat it with the facts or the truth.

What makes these purposes unacceptable are the unconstitutional methods chosen to pursue them. It is a legitimate purpose of police investigation to gather evidence and muster information that will surround a guilty defendant and make it difficult if not impossible for him to escape justice. It is proper to anticipate defenses and to work vigorously to meet them. But when the methods chosen to gather such evidence and information are deliberately unlawful and flout the Constitution, the legitimacy is lost.

We conclude, based on the totality of the facts and circumstances, that the conduct of the Task Force, in the words of *Rochin*, is nothing less than "shock[ing] to the conscience." ' "It is abiding truth that '[n]othing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.' " ' *Id.* at 724–25, 95 S.Ct. at 1222 (Brennan, J., dissenting (quoting *Harris*, 401 U.S. at 232, 91 S.Ct. at 649 (Brennan, J., dissenting))).

Our Constitution places strict limits on the behavior of law-enforcement officials. Each limit was wrought by the framers from those pages in history that collectively demonstrate the nearly unlimited capacity of an unrestrained government to infringe upon the inalienable rights of its citizens. Judge Noonan said in his dissent to the opinion of the original panel:

The police department and the sheriff's department had a great public emergency on their hands. It was imperative to catch the "Prime Time Rapist".... Barkman undoubtedly believed he was acting for the common good. But he had too narrow a notion of the common good. The common good includes fairness in police procedures, freedom from coercion, and access to requested counsel.

*Cooper*, 924 F.2d at 1539 (Noonan, J., concurring and dissenting).

IX *QUALIFIED IMMUNITY*

We have concluded that the Task Force violated Cooper's Fifth Amendment and Fourteenth Amendment rights; it also engaged in behavior which "shocks the conscience." Now we must consider whether the legal standards giving rise to these conclusions were " 'clearly established,' " *Mitchell*, 472 U.S. at 524, 105 S.Ct. at 2814 (citation omitted), at the time of the Task Force's conduct in this case. We conclude

that the relevant legal standards were clearly established in 1986, and that the members of the Task Force cannot avail themselves of the doctrine of qualified immunity.

The analysis in Parts V–VIII of this opinion is neither controversial nor difficult to understand; none of the cases cited are dubious or esoteric. It is bedrock Constitutional law that police officers may not attempt to compel or coerce a suspect into confessing by disregarding his clearly established civil rights. As their depositions show, members of the Task Force *knew* they were violating Cooper's Constitutional rights, even though they hoped—unreasonably we believe—that the confession they expected to obtain would be deemed voluntary.

The members of the Task Force should have known their actions would violate the Constitution itself in that their purpose was to compel Cooper to be a witness against himself; this is enough to deprive them of immunity. We repeat what the Supreme Court said about qualified immunity in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987): "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 640, 107 S.Ct. at 3039 (citation omitted). Indeed, it would seem that the Supreme Court had the present situation in mind in *Briggs,* when it stated that the defense of qualified immunity is not available to officers who "knowingly violate the law." *Briggs,* 475 U.S. at 341, 106 S.Ct. at 1096.

Given *Mincey,* it is ironic for the officers in this case to be claiming their conduct was not clearly established as unconstitutional. Although Mincey's statements had been used at trial only for impeachment purposes, *Mincey,* 437 U.S. at 397, 98 S.Ct. at 2416, the Court reversed his conviction. "Statements made by a defendant in circumstances violating the strictures of *Miranda v. Arizona* are admissible for impeachment if their 'trustworthiness ... sat-

isfies legal standards.' But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law...." *Id.* at 397–98, 98 S.Ct. at 2416 (citations omitted) (first omission in original).

Although *Mincey* involved facts in some ways more egregious (but in some ways less egregious) than those presented here, it establishes that the unlawfulness of the Task Force's approach was apparent. *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

The doctrine of qualified immunity was designed to ensure that officials would not be chilled in the proper exercise of their public duties.

> Under the standard of qualified immunity ... [an official] will be entitled to immunity so long as his actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." This standard will not allow [the official] to carry out his ... functions wholly free from concern for his personal liability; he may on occasion have to pause to consider whether a proposed course of action can be squared with the Constitution and laws of the United States. But this is precisely the point of the [qualified immunity] standard: "Where an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate...."

*Mitchell,* 472 U.S. at 524, 105 S.Ct. at 2814 (citations omitted) (last omission in original). Here, members of the Task Force did not hesitate; instead they set out to and did violate rights which they knew the Constitution guaranteed. Qualified immunity is manifestly inapplicable, even on the appellants' version of what happened.

### X CONCLUSION

It is clearly established law that the Fifth and Fourteenth Amendments forbid the use of compulsion and coercion by law enforcement in pursuit of a confession. As far as the police are concerned, any violation is complete at the time of the offending behavior. Behavior like the Task

Force's shocks the conscience: it deprived Cooper of "one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself." *Miranda*, 384 U.S. at 457–58, 86 S.Ct. at 1619. Indeed, one would have thought it unnecessary to spend so much time reiterating the settled law in an appellate opinion. Yet the facts of this case indicate that these law-enforcement officers resist that message. It is this stubborn resistance that has generated this lawsuit, not any lack of clarity as to the law.

 This case is an example of officials who deliberately choose to ignore the law and the Constitution in favor of their own methods. For victims caught in their snare, the Constitution of the United States becomes a useless piece of paper. When law-enforcement officials act this way, they invite redress under § 1983.[13]

AFFIRMED.

WIGGINS, Circuit Judge, Concurring:

I respectfully concur. I write separately only to emphasize that our decision in this case does not expand liability under 42 U.S.C. § 1983 to include ordinary *Miranda* rights advisement violations.

Appellants argue that this case involves only an ordinary *Miranda* violation, a violation of the prophylactic safeguards which every police officer must afford an individual when they are taken into custody. But that argument ignores the rationale for having such safeguards. The rights advisement mandated by *Miranda* is intended to protect the substantive constitutional right to remain silent guaranteed by the Fifth Amendment. In the present case, the police conduct went far beyond an ordinary *Miranda* rights advisement violation. The police conduct violated Cooper's constitutional right to remain silent. It is the violation of Cooper's Fifth Amendment right rather than the faulty rights advise-

ment which gives rise to the section 1983 liability in this case.

The constitutional privilege against self-incrimination is "fully applicable during a period of custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 460–61, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1965). As the Supreme Court stated in *Miranda*, "once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. at 1627. Furthermore, the Court held that the same requirements apply to a request for counsel. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Id.* at 474, 86 S.Ct. at 1627. Thus, the request for counsel is a per se invocation of the constitutional right to remain silent. *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) (referring to *Miranda's* "rigid rule that an accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring all interrogation to cease."). The Court reaffirmed this conclusion in *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), stating that its purpose was to protect suspects in custody "from being badgered by police officers." *Id.* at 1044, 103 S.Ct. at 2834. Failure by the police to cease interrogation after an invocation of the right to remain silent is a violation of the Fifth Amendment which is actionable under 42 U.S.C. § 1983.

If the present case only involved allegations that the *Miranda* rights advisement was faulty, then there could be no liability under section 1983. Liability under section 1983 is limited to violations of established constitutional rights. A suspect does not have a constitutional right to the *Miranda* rights advisement, as the rights advisement is simply a prophylactic device de-

---

**13.** Contrary to the holding of the original panel, Cooper is not yet entitled to attorneys' fees under 42 U.S.C. § 1988 because he has not yet prevailed on a claim. *Hawrahan v. Hampton*, 446 U.S. 754, 757, 100 S.Ct. 1987, 1989, 64

L.Ed.2d 670 (1980) (per curiam). Section 1988 does not provide for attorneys' fees where a party merely establishes his right to a trial. *Tribble v. Gardner*, 860 F.2d 321, 328 (9th Cir. 1988).

signed to protect the underlying constitutional right to remain silent. This case, however, involves a violation of the underlying constitutional right. Cooper repeatedly requested an attorney be present during his interrogation. The police officers repeatedly ignored his requests and continued to interrogate him. The officers' continued interrogation of Cooper after his per se invocation of his Fifth Amendment rights was a violation of his substantive constitutional right to remain silent. Thus, Cooper has adequately alleged a cause of action under section 1983.

I would affirm the district court.

BRUNETTI, Circuit Judge, with whom Circuit Judges LEAVY and ALARCON, join, dissenting:

Police interrogated Michael Cooper for four hours, and, according to their plan, ignored his requests to consult with his attorney. None of Cooper's statements obtained during this interrogation were used against him in any criminal proceeding.

In questioning Cooper, the police intentionally disregarded the prophylactic procedures mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The consequence of such a violation of *Miranda* safeguards is the suppression of the statements at any criminal proceedings. This prevents a violation of the Fifth Amendment by prohibiting the state from compelling a defendant to be a witness against himself by *using* his presumptively coerced statements.

Because the violation of the *Miranda* procedure alone is not a violation of the Fifth Amendment, a remedy under 42 U.S.C. § 1983 is not available under a Fifth Amendment theory.

Nor has Cooper stated a valid § 1983 claim under a due process theory. The interrogation of Cooper was not accomplished in such an outrageous fashion as to shock the conscience and thus deprive Cooper of his substantive due process rights. The police used interrogation methods that were harsh but which have been held to satisfy the requirements of due process. Their techniques, employed during four hours of questioning, involved no physical abuse or threats of physical abuse.

Because their conduct did not violate the Fifth Amendment and thus would not provide a § 1983 cause of action under that amendment, it would be anomalous to bootstrap the claim through a due process analysis when the amendment on point was not violated.

Because Cooper has not stated a cause of action under 42 U.S.C. § 1983, I respectfully dissent.

I

Section 1983 provides that any person acting under color of state law shall be liable for any injuries caused by a "deprivation of any rights, privileges, or immunities *secured by the Constitution and laws*" of the United States. 42 U.S.C. § 1983 (emphasis added). "The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.' " *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979).

One of Cooper's claims is that the police conduct violated the Fifth Amendment. The Fifth Amendment provides that "no person ... shall be compelled in any criminal case to be a witness against himself." The question then is whether the police violated that right when they continued to question Cooper despite his request for a lawyer and his indications that he did not wish to answer any more questions.

There is no question that the police procedure violated the *Miranda* safeguards and that the Fifth Amendment would prohibit the government from using any of the statements against Cooper in court. The majority, however, also contends that the police violated Cooper's underlying Fifth Amendment rights. This conclusion is contrary to direction from the Supreme Court and to the language of the Fifth Amendment itself.

First, Cooper was not compelled to be a witness against himself in any criminal case. He faced no trial and accordingly none of his statements were offered

against him. The language of the amendment, then, suggests that there was no violation of the Fifth Amendment.

The majority, however, finds that *Miranda* "extend[ed] the Fifth Amendment into police stations." Opinion at 1239. From this, the majority concludes that police action in refusing to honor a request to remain silent and a request for counsel is a violation of the Fifth Amendment. This is a misreading of *Miranda.*

*Miranda* essentially held that statements obtained from criminal defendants during custodial interrogations would not be admissible in court against those defendants unless the police followed appropriate safeguards designed to insure the absence of coercion in obtaining any incriminating statements.

The limitations of the holding of *Miranda* are apparent from the first sentence of Section I of the opinion: "The constitutional issue we decide in each of these cases is the *admissibility* of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom in any significant way." *Miranda,* 384 U.S. at 445, 86 S.Ct. at 1612 (emphasis added).

The Court did not hold, nor did it need to hold, that the Fifth Amendment can be violated absent the use of an incriminating statement against a criminal defendant in court. Instead, the decision sought to avoid the admission in court of statements improperly coerced from criminal defendants.

This reading of the Fifth Amendment and of *Miranda* has been confirmed by subsequent Supreme Court decisions. The decisions reinforce that the purpose of *Miranda* is to prevent presumptively coerced and involuntary statements from being used against criminal defendants. In *Connecticut v. Barrett,* 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the Supreme Court discussed *Miranda's* rule that "once the accused 'states that he wants an attorney, the interrogation must cease until an attorney is present.'" *Id.* at 528, 107 S.Ct. at 831. The Court stated: "It remains clear, however, that this prohibition on further questioning—like other aspects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but instead is justified only by reference to its prophylactic purpose." *Id.* (emphasis added).

Likewise, in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Court explained:

> The *Miranda* exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion.

*Id.* at 306–07, 105 S.Ct. at 1291–92 (emphasis in original). In a footnote, the Court added: "A *Miranda* violation does not *constitute* coercion but rather affords a bright-line, legal presumption of coercion, requiring suppression of all unwarned statements." *Id.* at 306 n. 1, 105 S.Ct. at 1292 n. 1 (emphasis in original).

In *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), which the majority contends bolsters its argument that the Fifth Amendment can be violated absent any use of incriminating statements, the Court was concerned once again only with preventing the *use* at trial of an incriminating statement. *Id.* at 435, 94 S.Ct. at 2359.

These discussions support the proposition that it is the *use* of coerced statements that constitutes a Fifth Amendment violation. The consistent thrust of the Supreme Court decisions has been to prevent the unconstitutional use of such statements. The *Miranda* requirements are measures designed to help prevent such unconstitutional use of coerced statements.

This view is supported by a case on point by the Eighth Circuit. In *Warren v. City of Lincoln,* 864 F.2d 1436, 1442 (8th Cir.) (en banc), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), the

court found that the failure of officers to read a suspect his *Miranda* rights and a subsequent denial of his requests for counsel did not support a § 1983 claim. *See also Davis v. City of Charleston,* 827 F.2d 317, 322 (8th Cir.1987) (failure of officers to give *Miranda* warnings did not deprive suspect of constitutional rights because no statements obtained during custodial interrogation were used against suspect at trial); *Bennett v. Passic,* 545 F.2d 1260, 1263 (10th Cir.1976) ("The *Miranda* decision does not even suggest that police officers who fail to advise an arrested person of his rights are subject to civil liability; it requires, at most, only that any confession made in the absence of such advice of rights be excluded from evidence.").

The majority attempts to limit its holding by stating that it is not finding a § 1983 cause of action where merely *Miranda* safeguards are violated. For example, the majority opines that "[t]his case does not establish a cause of action where police officers continue to talk to a suspect after he asserts his rights and where they do so in a benign way, without coercion or tactics that compel him to speak." Opinion at 1244.

This purported limit is illusory. The main point of the majority opinion seems to be that the authorities' deliberate disregard of *Miranda* safeguards—that is, their failure to stop questioning Cooper when he requested a lawyer—led to the coercion and Cooper's imprisonment in a "totalitarian nightmare." Opinion at 1243.

When, then, in the majority's view, would such a deliberate disregard of *Miranda* rights *not* represent "coercion or tactics that compel him to speak?" Opinion at 1244. The majority opinion provides no meaningful guidance and is likely to lead to a quagmire of claims that could be avoided by limiting claims to actual violations of the Fifth Amendment.

## II

Cooper also claims that the police conduct during his interrogation deprived him of his rights to substantive due process under the Fourteenth Amendment. This claim also must fail because the techniques used by the police in their interrogation were not so extreme as to shock the conscience.

In *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), the Supreme Court held that police who broke into a suspect's house, struggled to open his mouth to remove capsules, and then directed medical personnel to remove the capsules from his stomach by means of a tube violated the suspect's right to due process because it amounted to conduct that "shocks the conscience." *Id.* at 172, 72 S.Ct. at 209. "They are methods too close to the rack and the screw to permit of constitutional differentiation." *Id.*

The police methods in this case do not shock the conscience. As stated by the original panel's decision in this case, Cooper's substantive due process claim rests on his assertion that:

> [H]e was interrogated for four hours, that the police officers used psychological pressure to attempt to coerce him into confessing, that his numerous requests to see an attorney were denied, that he was angry and upset, that he was questioned regarding his religious beliefs, that he had a psychological condition which made him particularly susceptible to stress from interrogation, and that he was held incommunicado for twenty-four hours before finally being released.

924 F.2d at 1530. I do not defend the police techniques. I simply contend the techniques do not shock the conscience as did the conduct in *Rochin* and other substantive due process cases involving police misconduct. Cooper was not physically assaulted in any way, he was not deprived of sleep, nor was he subjected to incommunicado interrogation over a period of days. His interrogation lasted only four hours and consisted of rough questioning by the police. It was hardly, as the majority asserts, "sophisticated psychological torture." Opinion at 1248.

In *Wilcox v. Ford,* 813 F.2d 1140, 1146–48 (11th Cir.), *cert. denied,* 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987), the

Eleventh Circuit found that police officers did not violate the due process rights of a suspect when they used extreme methods in questioning witnesses. The procedural posture of the parties in *Wilcox* differs markedly from the situation in this case: the plaintiff in *Wilcox* was a habeas corpus petitioner claiming that rough police interrogation of potential witnesses violated *his* due process rights. Nonetheless, the court's analysis of whether the police conduct in that case was "shocking to the universal sense of justice" is helpful here.

The *Wilcox* court noted that:

> The transcripts reflect that the interrogating officers threatened to charge Wrentz with murder, threatened to lynch him, put words in his mouth, and told him he was headed for eternal damnation ... Marshall [another potential witness] received similar treatment.... Marshall was interrogated for eight and a half hours without being provided with food or water. The officers then threatened to send him to the electric chair along with two other Wilcox employees and also told him that he would die in prison.

*Id.* at 1147.

The court found that such interrogation techniques did not violate the suspect's due process rights. "The police misconduct here, while not commendable, is not so extreme that it violates a sense of 'fundamental fairness, shocking to the universal justice.'" *Id.* at 1148.

What really offends the majority and seems to support its conclusion of a substantive due process violation is the fact that the officers interrogated Cooper in knowing violation of his *Miranda* rights. This is not enough to establish a violation of substantive due process rights.

As discussed above, the police conduct did not violate Cooper's substantive Fifth Amendment rights. To hold that the officers nonetheless violated a separate constitutional right because they disregarded prophylactic rules designed to safeguard Fifth Amendment rights is anomalous.

The Supreme Court has indicated that *Miranda* rights themselves are not constitutional rights. Bootstrapping a constitutional claim through a due process analysis sidesteps this fundamental point.

The Supreme Court's instruction that there should be "great reluctance to expand the reach" of substantive due process in fundamental rights cases applies here as well. *See Bowers v. Hardwick*, 478 U.S. 186, 195, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986).

Because Cooper's allegations do not show a violation of substantive due process, he has not stated a valid § 1983 claim based on the Due Process Clause.

## III

In its zeal to respond forcefully to the deplorable police conduct in this case, the majority has departed from the clear requirements for § 1983 actions. As Cooper has not shown that the appellant's actions constitute a violation of Fifth Amendment or substantive due process constitutional rights, I would reverse the district court and grant summary judgment for all appellants on Cooper's § 1983 claims based upon these constitutional grounds.

I respectfully dissent.

LEAVY, Circuit Judge, with whom Circuit Judges ALARCON and BRUNETTI join, dissenting:

I join in Judge Brunetti's dissent and add these further reasons:

The Miranda court said in 1966:

> The warnings required and the waiver necessary in accordance with our opinion today, are in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by the defendant.

*Miranda,* 384 U.S. at 476, 86 S.Ct. at 1629.

Two years later the 80th Congress passed and President Johnson signed into law what is now 18 U.S.C. § 3501,[1] which

---

**1.** Section 3501 reads, in part:

 (a) In any criminal prosecution brought by the United States or by the District of Colum-

bia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is

makes voluntary confessions admissible in evidence in the courts of the United States and the District of Columbia. Section 3501 requires the courts to consider various factors including all the Miranda warnings, but says, "The presence or absence of any of the above mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession."

Neither the Supreme Court nor this court has held that 18 U.S.C. § 3501 is unconstitutional. Congress apparently thought it had a better fact finding process than that of the Supreme Court when it concluded that the standards in section 3501 were constitutionally adequate to avoid the abuses of the past.

Plaintiffs, in their first count, allege a denial of the right to counsel and the right to remain silent. The majority refers to the claim as the alleged violation of Cooper's substantive constitutional rights, instead of merely violations of the procedural safeguards provided by Miranda.

Whatever the majority finds to be so clear about the legal standards in 1986 did not prevent the plaintiffs from including as part of their first claim what they thought was a violation of a "substantive right" to counsel. Plaintiffs now concede that portion of the claim is inapposite because Cooper was never charged in court. The remaining portion of the first claim is the "substantive right" to remain silent. How was a clearly established substantive right to remain silent, which the majority finds Miranda was designed to protect, violated

when a President and Congress have suggested that Miranda rights do not even necessarily control the admissibility of statements?

The majority assures us that "this case does not establish a [section 1983] cause of action where police continue to talk to a suspect after he asserts his rights and where they do so in a benign way, without coercion or tactics that compel him to speak." Opinion at 1244. I ask: what happens in that case to what the majority says is a substantive right to remain silent? It is lost even without a waiver if it is taken away in a benign way?

The majority says, "What we do confront is a case laden with police misconduct that is identical with the historical practice [of incommunicado interrogation] at which the right against self-incrimination was aimed." Cooper had been informed jokingly of his Miranda rights, interrogated for twenty minutes in the probation office, and at the end of the interview formally arrested. He then made his first request for an attorney and was transported to the sheriff's department. The majority says "it is our view that every word he uttered after he was taken to the sheriff's department was compelled." Opinion at 1243. Apparently the majority is holding that "compulsion" to this extent renders subsequent statements involuntary and calls for a section 1983 remedy.

Whatever the holding of the majority may be, it comes in a case in which whatever was "coerced" from the accused con-

---

received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

(b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of

the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

vinced his interrogators of his innocence and was apparently totally consistent with the truth. In my view, no privilege against self-incrimination is lost until a court erroneously admits into evidence an involuntary or otherwise infirm statement.